131 F.3d 273
 26 Media L. Rep. 1033
 GENERAL MEDIA COMMUNICATIONS, INC.; International
Periodical Distributors Association; National Association
of Recording Merchandisers; Periodical and Book Association
of America, Inc.; Recording Industry Association of
America, Inc.; Video Software Dealer Association,
Plaintiffs-Appellees,
v.
William S. COHEN, in his official capacity as Secretary of
Defense; Department of Defense, Defendants-Appellants.
 No. 1853, Docket 97-6029.
 United States Court of Appeals,
Second Circuit.
 Argued April 16, 1997.
Decided Nov. 21, 1997.
 
 Daniel S. Alter, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Marla Alhadeff, Steven M. Haber, Assistant United States Attorneys, on the brief), for Defendants-Appellants.
 Michael A. Bamberger, Sonnenschein Nath & Rosenthal, New York City (Helen B. Kim, Frederick S. Young, Rachelle Barstow, Gregory Y. Porter, on the brief), for Plaintiffs-Appellees.
 Melissa Wells-Petry, Washington, DC, for amicus curiae Family Research Council Military Readiness Project in support of Defendants-Appellants.
 Jenner & Block, Washington, DC (Ann M. Kappler, Jodie L. Kelley, Gregory P. Magarian, Jenner & Block, Washington, DC; Burton Joseph, Barsy, Joseph & Lichtenstein, Chicago, IL; James Cregan, Magazine Publishers of America, Inc., Washington, DC, on the brief), for amici curiae Playboy Enterprises, Inc. and Magazine Publishers of America in support of Plaintiffs-Appellees.
 Cathy Crosson, Bloomington, IN, for amicus curiae Feminists for Free Expression in support of Plaintiffs-Appellees.
 Before: WINTER, Chief Judge, and CABRANES and PARKER, Circuit Judges.
 JOSE A. CABRANES, Circuit Judge:
 
 
 1
 In this appeal, we address whether Congress exceeded its constitutional authority in banning the sale or rental of "sexually explicit materials" by military personnel acting in an official capacity, including the sale or rental of such materials by "military exchanges."[1] The United States District Court for the Southern District of New York (Shira A. Scheindlin, Judge ) enjoined enforcement of the Military Honor and Decency Act of 1996, 10 U.S.C. § 2489a (the "Act"), after concluding that it violates the Free Speech Clause of the First Amendment[2] and the Due Process Clause of the Fifth Amendment.[3] General Media Communications, Inc. v. Perry, 952 F.Supp. 1072 (S.D.N.Y.1997).
 
 
 2
 Heeding the Supreme Court's admonition that "judicial deference ... is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged," Rostker v. Goldberg, 453 U.S. 57, 70, 101 S.Ct. 2646, 2655, 69 L.Ed.2d 478 (1981), we hold that Congress acted well within its constitutional authority to regulate official military conduct.
 
 
 3
 Congress has not banned sexually explicit magazines and videos--soldiers and sailors may still buy them elsewhere, receive them by mail, and read or watch them; Congress has decided only that the military itself will not be in the business of selling or renting these items to servicemembers. The appellees, who include publishers and producers of sexually explicit materials, argue that their free speech rights will be abridged if the military stops selling and renting their products. But military exchanges are not public streetcorners; they are not available for everyone to "speak" from their shelves. These stores are nonpublic forums in which the government may restrict the content of speech, so long as the restriction is reasonable and it does not discriminate among particular viewpoints. Congress has regulated the military's purchase and resale of materials constituting a particular subject matter--lascivious depictions of nudity including sexual or excretory activities or organs--not those reflecting particular viewpoints. This policy avoids the appearance that the military, by selling sexually explicit materials in military exchanges, endorses these materials. As such, the policy is a reasonable way for Congress to uphold the military's image and core values of honor, professionalism, and discipline. Because the Act reasonably furthers legitimate governmental interests in a nonpublic forum without engaging in viewpoint discrimination, it does not violate the Free Speech Clause of the First Amendment.
 
 
 4
 The Act also does not violate the Fifth Amendment. Congress has considerable leeway in drawing distinctions as it decides how to implement particular policies. Insofar as the Act does not violate the First Amendment, its definitions and distinctions need only be rationally related to legitimate governmental interests. It passes that test, and so does not violate the equal protection guarantee of the Fifth Amendment. The Act's terms and meaning are also sufficiently clear to give the appellees notice of what will no longer be sold in military exchanges, and so the Act is not unconstitutionally vague.
 
 
 5
 The Constitution does not, of course, stop at the gates of a military base. But within those gates, "the rights of [persons] in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty." Parker v. Levy, 417 U.S. 733, 744, 94 S.Ct. 2547, 2556, 41 L.Ed.2d 439 (1974) (internal quotation marks and citations omitted). Congress, acting under its authority to maintain and regulate the armed forces, may constitutionally place some restrictions on the speech that occurs under military command. The Military Honor and Decency Act of 1996 embodies such a set of constitutional restrictions. Accordingly, we vacate the judgment of the district court and remand with instructions to enter judgment for the appellants.
 
 I.
 
 6
 The Military Honor and Decency Act became effective on December 22, 1996, and provides in pertinent part:
 
 
 7
 (a) PROHIBITION OF SALE OR RENTAL. The Secretary of Defense may not permit the sale or rental of sexually explicit material on property under the jurisdiction of the Department of Defense.
 
 
 8
 (b) PROHIBITION OF OFFICIALLY PROVIDED SEXUALLY EXPLICIT MATERIAL. A member of the armed forces or a civilian officer or employee of the Department of Defense acting in an official capacity may not provide for sale, remuneration, or rental sexually explicit material to another person.
 
 
 9
 (c) REGULATIONS. The Secretary of Defense shall prescribe regulations to implement this section.
 
 
 10
 (d) DEFINITIONS. In this section:
 
 
 11
 (1) the term "sexually explicit material" means an audio recording, a film or video recording, or a periodical with visual depictions, produced in any medium, the dominant theme of which depicts or describes nudity, including sexual or excretory activities or organs, in a lascivious way.
 
 
 12
 10 U.S.C. § 2489a. Pursuant to section 2489a(c), the Department of Defense issued a "directive-type memorandum"[4] implementing the Act that also became effective on December 22, 1996. This memorandum contains the following pertinent definitions:1. Material. An audio recording, a film or video recording, or a periodical with visual depictions, produced in any medium.
 
 
 13
 2. Sexually Explicit Material. Material the dominant theme of which is the depiction or description of nudity, including sexual or excretory activities or organs, in a lascivious way.
 
 
 14
 3. Dominant Theme. A theme of any material that is superior in power, influence, and importance to all other themes in the material combined.
 
 
 15
 4. Lascivious. Lewd and intended or designed to elicit a sexual response.
 
 
 16
 Joint App. at 63, reproducing DoD Directive-Type Memorandum, "Sale or Rental of Sexually Explicit Material on DoD Property" (Dec. 22, 1996). The memorandum also provides that "[m]aterial shall not be deemed sexually explicit because of any message or point of view expressed therein."
 
 
 17
 In addition, the memorandum establishes the "Resale Activities Board of Review" (the "Board"). The Board is obliged periodically to review material offered for sale or rental on military property to determine whether such material is sexually explicit. Any material that the Board finds to be "sexually explicit" according to the stated terms of the memorandum is to be withdrawn from military retail outlets.
 
 
 18
 The district court found, and the parties do not dispute, that the Act bans only the sale or rental of sexually explicit material on military property. The Act does not restrict the possession of such material on military property, nor does it prohibit military personnel from sharing such material with their colleagues, so long as they do not sell or rent it. Additionally, military personnel may buy sexually explicit material off military property or order it through the mail. See General Media, 952 F.Supp. at 1075.
 
 
 19
 Appellee General Media Communications, Inc. ("GMC") publishes various periodicals, including Penthouse. The other appellees are various trade associations representing businesses engaged in the production, wholesale and retail distribution, and sale of periodicals, books, sound recordings, and home videos throughout the country.
 
 
 20
 Appellees brought suit in the district court in October 1996 seeking an injunction barring the enforcement of the Act and a declaratory judgment that the Act is unconstitutional. Appellees alleged, inter alia, that the Act infringes their rights to free speech and equal protection of the laws, in violation of the First and Fifth Amendments, and that the act is unconstitutionally vague, in violation of the Fifth Amendment. See General Media, 952 F.Supp. at 1075. On December 20, 1996, two days before the Act was to go into effect, the district court issued a temporary restraining order enjoining appellants from enforcing the Act until the court had decided appellees' motion for a preliminary injunction. Following parties' submissions of affidavits and declarations, the district court heard oral argument on December 31, 1996, and on January 13, 1997, the parties agreed to treat appellees' motion for a preliminary injunction as one for a permanent injunction. Id.; see Fed.R.Civ.P. 65(a)(2).
 
 
 21
 In an opinion and order dated January 22, 1997,[5] the district court granted appellees' request for injunctive relief, finding that the Act (i) infringed appellees' free speech rights in violation of the First Amendment; (ii) violated the equal protection guarantee of the Fifth Amendment; and (iii) violated the Due Process Clause of the Fifth Amendment in that it is unconstitutionally vague. See General Media, 952 F.Supp. at 1084.
 
 
 22
 The district court determined that "the purpose of the Act is to ban expression that is lewd." Id. at 1080. The district court further held that "because the First Amendment prevents the government from banning material solely because it is offensive," the Act violates the First Amendment. Id. The district court rejected the government's argument that the Act reasonably seeks to protect the military's professional appearance and to promote the military mission by fostering core values among personnel. The court reasoned that the Act "does nothing whatsoever to reduce the actual presence of sexually explicit material on military property," and that, absent congressional findings of fact, "it is unreasonable to equate the sale or rental of sexually explicit material in military exchanges with an official 'endorsement' " of that material. Id. at 1080-81.
 
 
 23
 Subjecting the Act to strict scrutiny, the court also held that section 2489a violated the equal protection guarantee of the Fifth Amendment. Id. at 1081-82. The district court noted that Congress made no factual findings, and that there was no evidence in the record, linking the Act to the military's goals of maintaining a professional image and of promoting core values. Similarly, the court found that there was no factual predicate to support the Act's distinction between audio or pictorial expression as opposed to written texts, as well as its differing treatment of books as opposed to periodicals. Id. at 1082.
 
 
 24
 The district court also held that the Act was void for vagueness because "the term 'lascivious' as it is used by the Act contains a subjective element." Id. at 1083. According to the district court, the risk that government officials would arbitrarily classify materials as sexually explicit "impermissibly chills plaintiffs' First Amendment rights," notwithstanding the fact that, as the court conceded, "plaintiffs cannot be directly penalized under the Act because its effect is only to prevent military personnel from stocking their products." Id.
 
 
 25
 This appeal followed.
 
 II.
 
 26
 We review the district court's order entering a permanent injunction for abuse of discretion, which "can be found if the district court relied upon a clearly erroneous finding of fact or incorrectly applied the law." See Schulz v. Williams, 44 F.3d 48, 53 (2d Cir.1994) (internal quotation marks omitted). We consider in turn each component of the district court's decision that the Act (i) violates the Free Speech Clause of the First Amendment; (ii) violates the equal protection guarantee of the Due Process Clause of the Fifth Amendment; and (iii) is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment.
 
 A. The First Amendment
 1. Forum Analysis
 
 27
 For purposes of the First Amendment's Free Speech Clause, the Supreme Court characterizes government property as falling into one of three categories. First, there is the "traditional public forum," which includes public streets and parks, and other "places which 'by long tradition or by government fiat have been devoted to assembly and debate.' " Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985) (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983)). The second category of government property is the "designated" public forum--"a place not traditionally open to assembly and debate," Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449, but "which the State has opened for use by the public as a place for expressive activity," Perry, 460 U.S. at 45, 103 S.Ct. at 955. In both traditional and designated forums that are fully open to the public, content-based regulations of speech are subject to the "highest scrutiny," and are permissible only if "narrowly drawn to achieve a compelling [governmental] interest." International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992).[6]
 
 
 28
 The third category of property, of most relevance in this case, is known as the "nonpublic forum," which consists of all remaining public property. Id. at 678-79, 112 S.Ct. at 2705-06. A limitation on speech in a nonpublic forum may be content-based, see R.A.V. v. City of St. Paul, 505 U.S. 377, 390 n. 6, 112 S.Ct. 2538, 2547 n. 6, 120 L.Ed.2d 305 (1992), and "need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." Lee, 505 U.S. at 679, 112 S.Ct. at 2705; see also Paulsen v. County of Nassau, 925 F.2d 65, 69 (2d Cir.1991) (in nonpublic forum, "the state has maximum control over communicative behavior since its actions are most analogous to that of a private owner").
 
 
 29
 Governmental intent is said to be the "touchstone" of forum analysis. Paulsen, 925 F.2d at 69. The government does not create a public forum "by inaction or by permitting limited discourse," Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449, and when the state reserves property for its "specific official uses," it remains nonpublic in character, Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 761, 115 S.Ct. 2440, 2446, 132 L.Ed.2d 650 (1995). The Supreme Court has recognized that the government's dedication of property to a commercial enterprise is "inconsistent with an intent to [create] a public forum." Cornelius, 473 U.S. at 804, 105 S.Ct. at 3450. Likewise, evidence that the government has created a forum to further efficiency and administrative convenience suggests that the forum is nonpublic. See id. at 805, 105 S.Ct. at 3450-51. It is also well established that the presence of some expressive activity in a forum does not, without more, render it a public forum. Id. (citing United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 130 n. 6, 101 S.Ct. 2676, 2685 n. 6, 69 L.Ed.2d 517 (1981)).
 
 
 30
 Furthermore, the Supreme Court has emphasized that "it is 'the primary business of armies and navies to fight or be ready to fight wars should the occasion arise.' ... And it is consequently the business of a military installation ... to train soldiers, not to provide a public forum." Greer v. Spock, 424 U.S. 828, 837-38, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976) (quoting United States ex rel. Toth v. Quarles, 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955)). Accordingly, "[a]lmost without exception, courts have concluded that military bases fall into the non-public forum category." Shopco Distrib. Co. v. Commanding General, 885 F.2d 167, 172 (4th Cir.1989). Military property generally becomes public in character only when the government has intentionally "abandoned any right to exclude civilian traffic and any claim of special interest in regulating expression." United States v. Albertini, 472 U.S. 675, 685-86, 105 S.Ct. 2897, 2905, 86 L.Ed.2d 536 (1985).
 
 
 31
 Appellees argue that the military exchanges are public forums.[7] Focusing specifically on the "newsstands" and "bookstores" within the exchanges, appellees invite us to adopt the view that these "newsstands" are public forums because the government has granted "access" to these places to magazines, newspapers, and other "speakers." We respectfully decline this invitation.
 
 
 32
 As noted above, governmental intent is the touchstone for determining whether a public forum has been created. In this inherently factual inquiry into intent, we may look to factors such as the government's policy and practice with respect to the forum, the nature of the property, and its compatibility with expressive activity. See Cornelius, 473 U.S. at 802, 105 S.Ct. at 3448-49.
 
 
 33
 As an historical matter, exchanges and their predecessors, canteens, were established in the 1890s to provide uniformity of operation and control that had been lacking under the earlier system, in which profiteering private "sutlers" followed and supplied the troops. See Joint App. at 407-410, reproducing Maj. Stephen E. Castlen, Let the Good Times Role: Morale, Welfare, and Recreation Operations, Army Lawyer, June 1996, at 3, 5-6. The government did not create military exchanges for the purpose of providing a forum for expressive activity. Today, as in the past, the purpose of the military exchanges is to provide "authorized patrons with articles and services necessary for their health, comfort, and convenience and [to provide] a supplemental source of funding for [military morale, welfare, and recreation] programs." Joint App. at 114, reproducing DoD Directive 1330.9 (Dec. 15, 1986). Although it is true that military exchanges sell books, periodicals, and other expressive materials, they also sell many other non-expressive materials. The mere fact that expressive materials are among the wide variety of general merchandise sold at the exchanges does not imply that the forum thereby becomes a public forum for First Amendment purposes. See Cornelius, 473 U.S. at 805, 105 S.Ct. at 3450-51. Rather, because military exchanges are "engaged in commerce," their operation is generally inconsistent with the creation of a public forum. Lehman v. City of Shaker Heights, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (plurality opinion).
 
 
 34
 The exchanges themselves are in no way public, in order to use a military exchange, or to purchase anything inside, patrons must show military identification. Only military personnel, their dependents, orphans, surviving spouses, and certain other affiliated personnel are admitted. These limits on patrons' access serve as another indicator that the government did not intend to dedicate the exchanges to expression and discourse; a limited audience would necessarily hinder, rather than further, the opportunities for communication by speakers such as appellees. The Supreme Court has noted that "separation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction." Lee, 505 U.S. at 680, 112 S.Ct. at 2706. As restricted-access areas, even on bases which may be otherwise open to the general civilian public, the exchanges are "separated" properties.
 
 
 35
 Moreover, far from granting unlimited access to military exchanges to various "speakers," the government has simply chosen to purchase certain magazines, newspapers, and videos from third parties, and has offered this merchandise for resale to its personnel at military exchanges. Much like a private sector retailer, the government identifies the products that it will stock for resale, selecting from a universe of merchandise that is far more extensive than the shelves of an exchange can hold. It does not offer to resell the merchandise of every producer, or every "speaker," who seeks access to those shelves. Cf. Air Line Pilots Ass'n Int'l v. Dept. of Aviation, 45 F.3d 1144, 1158 (7th Cir.1995) ("[T]he government's status as a proprietor is a factor entering into public forum analysis. Proprietor status suggests, for instance, that the government has the power to define or restrict the use to which public property should be dedicated." (internal citations omitted)). In particular, the exchanges are only authorized to sell certain enumerated products listed in Department of Defense regulations, including specific provisions governing the sale of reading materials. See, e.g., Joint App. at 147-50, reproducing Memorandum of Understanding, "Selling of Reading Materials in Military Commissaries Located on Army, Air Force Installations" (Apr. 29, 1994).
 
 
 36
 Because it cannot be said that the military has "abandoned any right to exclude civilian traffic and any claim of special interest in regulating expression," Albertini, 472 U.S. at 685-86, 105 S.Ct. at 2905, we hold that the military exchanges governed by the Act are nonpublic forums.
 
 2. Content & Viewpoint Discrimination
 
 37
 As noted above, the government may reasonably restrict expressive activity in a nonpublic forum on the basis of content, so long as the restriction is not "an effort to suppress the speaker's activity due to disagreement with the speaker's view." Lee, 505 U.S. at 679, 112 S.Ct. at 2705. Appellees argue that the Act is in fact viewpoint-discriminatory (a question that the district court did not reach).[8] Were we to accept this characterization, the Act would be subject to much more exacting constitutional scrutiny.[9] We do not, however, agree with appellees. The Act assuredly distinguishes between permissible and impermissible speech on the basis of content, but it does not rise to the level of viewpoint discrimination.
 
 
 38
 As the Supreme Court has noted, the distinction between content and viewpoint discrimination "is not a precise one." Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 831, 115 S.Ct. 2510, 2517-18, 132 L.Ed.2d 700 (1995). As a general matter, viewpoint discrimination represents a particularly "egregious" subset of content discrimination in which "the government targets not subject matter but particular views taken by speakers on a subject." Id. at 829, 115 S.Ct. at 2516. The Court thus suggests that the distinction is one between "subject matter" (content) and "a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered" (viewpoint). Id. at 831, 115 S.Ct. at 2517. Working from this concededly imprecise distinction, we conclude that the Act does not involve viewpoint discrimination.[10]
 
 
 39
 The Act prohibits the sale or rental of recordings and periodicals "the dominant theme of which depicts or describes nudity, including sexual or excretory activities or organs, in a lascivious way." 10 U.S.C. § 2489a(d). Appellees suggest that this construction targets a viewpoint portraying "women as sexual beings or as the focus of sexual desire," as well as a viewpoint of "lasciviousness." Appellees' Brief at 25. Even apart from the absence of any references to gender in the Act or its implementing directive,[11] we find this line of argument unconvincing. To conceive of lasciviousness as a "specific premise" or "a standpoint from which a variety of subjects may be discussed and considered" strikes us as linguistic overreaching; how, for example, would one go about discussing and considering the political issues of the day from a lascivious viewpoint? The adjective "lascivious" is much more plausibly understood as helping to identify more particularly the subject matter (i.e., content) that the Act encompasses: namely, depictions of nudity including sexual or excretory activities or organs, but only those depictions that are also lascivious.
 
 
 40
 We note that the Supreme Court has suggested in dicta, but in an opinion that strictly applied the Constitution's prohibition against viewpoint discrimination, that "[a] State might choose to prohibit only that obscenity which is the most patently offensive in its prurience, i.e., that which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive political messages." R.A.V., 505 U.S. at 388, 112 S.Ct. at 2546. Thus prurience and patent offensiveness are apparently permissible grounds on which to discriminate--and by implication, they do not constitute "viewpoints" (against which the government may not discriminate).[12] Insofar as R.A.V. equates prurience and patent offensiveness with "lascivious displays of sexual activity," lasciviousness too is impliedly not a "viewpoint." Other Supreme Court precedents construing the First Amendment support, by analogy, the reasoning that a distinction based on lasciviousness is viewpoint neutral. See Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 685, 106 S.Ct. 3159, 3165, 92 L.Ed.2d 549 (1986) (school's sanctions "in response to [respondent's] offensively lewd and indecent speech" were permissible, given that "the penalties imposed in this case were unrelated to any political viewpoint"); Board of Educ. v. Pico, 457 U.S. 853, 871, 102 S.Ct. 2799, 2810, 73 L.Ed.2d 435 (1982) (plurality opinion) ("an unconstitutional motivation would not be demonstrated" if school board removed books because they "were pervasively vulgar," rather than because of any intent to deny access to disfavored ideas).
 
 
 41
 In sum, we conclude that the Act discriminates on the basis of content, but not on the basis of viewpoint.
 
 3. "Reasonableness" Analysis:
 
 42
 We now reach the question actually decided by the district court: whether the Act's restrictions on expressive activity are reasonable and therefore consistent with the Free Speech Clause of the First Amendment. Employing the same reasonableness standard used by the district court, but reaching the opposite conclusion, we hold that they are.
 
 
 43
 Because we conclude that the Act regulates speech in a nonpublic forum in a viewpoint-neutral manner, the Act need only be reasonable in light of the purpose of the forum, Perry, 460 U.S. at 49, 103 S.Ct. at 957, and reflect a legitimate government concern, Paulsen, 925 F.2d at 69, in order to pass constitutional muster. The Supreme Court has admonished that a restriction in a nonpublic forum "need only be reasonable; it need not be the most reasonable or the only reasonable limitation." Cornelius, 473 U.S. at 808, 105 S.Ct. at 3452.
 
 
 44
 Furthermore, we have only recently noted that "[i]t is plain to us that governmental restrictions on speech that would run afoul of the Constitution if imposed in civilian life can pass constitutional muster in the military context." Able v. United States, 88 F.3d 1280, 1294 (2d Cir.1996). "Our review of military regulations ... is far more deferential than constitutional review of similar laws or regulations designed for civilian society ... and the tests and limitations to be applied may differ because of the military context." Id. (internal citations and quotation marks omitted).
 
 
 45
 This deference arises from the long-recognized distinctive conditions of military life. The Supreme Court has instructed that "[t]he military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps." Goldman v. Weinberger, 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986). This is so because, as the Court has observed, "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian, and ... the rights of [persons] in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty." Parker, 417 U.S. at 744, 94 S.Ct. at 2556 (internal citations and quotation marks omitted). Moreover, "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military ... affairs." Department of the Navy v. Egan, 484 U.S. 518, 530, 108 S.Ct. 818, 825, 98 L.Ed.2d 918 (1988).
 
 
 46
 As the Court has emphasized, "civil courts are ill equipped to establish policies regarding matters of military concern." Solorio v. United States, 483 U.S. 435, 448, 107 S.Ct. 2924, 2931, 97 L.Ed.2d 364 (1987) (internal quotation marks omitted). For these reasons, "judicial deference ... is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." Goldberg, 453 U.S. at 70, 101 S.Ct. at 2655. We are not free to ignore this admonition. We believe the district court erred by not giving due credit to the singular governmental interests in oversight of the military, and to the reasonableness of the measures selected to advance those interests in the instant case.
 
 
 47
 The appellees argue, and the district court apparently agreed, see General Media, 952 F.Supp. at 1080, that, in order to identify the governmental interest furthered by the Act, a court must find or uncover either legislative history or a statement of the purpose of the statute within its text.[13] The appellees have not drawn to our attention any authority for the proposition that a statute may be held defective because its legislative history is sparse or virtually non-existent, nor are we aware of any such authority. Indeed, if the sparseness of legislative history were a basis for invalidation of acts of Congress, a wide swath of legislation could fall before the judicial axe. In any event, the very title of the Act, the Military Honor and Decency Act, suggests the governmental interest that the statute purports to advance.
 
 
 48
 The government argues that the sale by the military of lascivious materials in military exchanges risks sending a message that the military approves of or endorses these materials. The pervasive authority of the hierarchical chain of command in the military setting could reasonably lead a servicemember to conclude that such materials were sanctioned by superior officers--a conclusion that would prove accurate, for example, in the case of Navy exchange facilities, where the Navy's resale regulations provide that "adult" magazine titles stocked by the exchange, and even the determination of which magazines qualify as "adult-oriented," are to be "coordinated with the base commanding officer." Joint App. at 204, reproducing Navy Resale Manual vol. 4, § 4108(6)(a)(1). The government argues that its sale of such materials could tarnish "the military's image of honor, professionalism, and proper decorum." It notes that "[t]he military also encourages its personnel to 'lead by example' and to display the highest form of personal and professional conduct." This policy, in the government's view, could be undermined if military personnel believed that military commanders approved of the sale of the proscribed materials at exchanges.[14] Accordingly, the government argues that the Act promotes military honor, professionalism, proper decorum, and military "core values."[15]
 
 
 49
 We are neither free nor inclined to disregard or treat cavalierly military goals and policies put forward by the government where Congress has exercised its constitutional responsibility of "mak[ing] Rules for the Government and Regulation of the land and naval Forces," U.S. Const. art. I, § 8, cl. 14, and the Chief Executive and "Commander in Chief of the Army and Navy of the United States," U.S. Const. art. II, § 2, cl. 1, has signed the Act into law and speedily implemented it by executive directive. The government's stated goals are clearly promoted by a policy of ending the military's involvement in the sale of sexually explicit materials. Accordingly, we hold that the Act reflects a legitimate governmental concern.
 
 
 50
 To pass constitutional muster, the Act must also be "reasonable" in light of the purpose of the forum. See Perry, 460 U.S. at 49, 103 S.Ct. at 957. As outlined above, the purpose of military exchanges is to operate as commercial outlets at which servicemembers may purchase "articles and services necessary for their health, comfort, and convenience." Revenues from exchanges also supplement the funding of military morale, welfare, and recreation programs. Congress could reasonably conclude that sexually explicit materials are not "necessary" to the health, comfort, and convenience of members of the armed forces. Furthermore, like any commercial retailer, the military must make decisions about what articles to stock on its limited shelf space. In doing so, a retailer may reasonably take into account not only profit margins, but also the special circumstances of its clientele. Here, the special circumstances of the military environment, in which the appearance of professionalism and proper conduct is critical, could reasonably lead to the conclusion that this retailer should not stock sexually explicit materials. The Act is thus reasonable in light of the purpose of the military exchange "forum."
 
 
 51
 The Act is also a "reasonable" means of promoting the government's legitimate interest in protecting the military's image and its core values. The Act bars the sale or rental of sexually explicit materials on military property by military employees acting in an official capacity. This legislation is specifically targeted at the problem identified above--that military honor, professionalism, and decorum will be affected or tainted by the official, military-sponsored sale of such materials. The problem the Act seeks to address, in short, is that the military should not be in the business of selling sexually explicit materials, and the solution embodied in the Act is to forbid the military from doing so. This would appear to be an altogether reasonable means of distancing the military from a perceived endorsement of these materials.
 
 
 52
 For the reasons set forth above, we hold that the Act does not violate the First Amendment.
 
 
 53
 B. The Equal Protection Guarantee of the Fifth Amendment's Due Process Clause
 
 
 54
 The district court also found that the Act violated the equal protection guarantee of the Due Process Clause of the Fifth Amendment. Specifically, it found that the Act's disparate treatment of books and periodicals (barring only the latter), and its restrictions on pictorial and audio expression, but not on written text, violated the Fifth Amendment's guarantee of equal protection. See General Media, 952 F.Supp. at 1082.
 
 
 55
 We approach equal protection claims under the Fifth Amendment in the same way as we would such claims under the Fourteenth Amendment. See Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975). In considering whether legislation violates equal protection principles, "[a]t a minimum, a statutory classification must be rationally related to a legitimate governmental purpose." Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988). Under this analysis, a statutory classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." FCC v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993).
 
 
 56
 Classifications affecting fundamental rights, however, must survive heightened scrutiny. Id. The Supreme Court has noted that "[w]hen government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." Carey v. Brown, 447 U.S. 455, 461-62, 100 S.Ct. 2286, 2290-91, 65 L.Ed.2d 263 (1980) (emphasis supplied) (finding equal protection violation based on discrimination among expressive activities in public forum); see also Police Dep't of City of Chicago v. Mosley, 408 U.S. 92, 96-97, 92 S.Ct. 2286, 2290-91, 33 L.Ed.2d 212 (1972) (same). That exacting standard of review is not applicable here, however, because "[t]he key to those decisions [Carey and Mosley ] ... was the presence of a public forum." Perry, 460 U.S. at 55, 103 S.Ct. at 960. Here, where a nonpublic forum is involved and where, as we have found, there is no First Amendment violation, the Act need only survive rational-basis analysis. See id. at 54-55, 103 S.Ct. at 959-60; Fighting Finest, Inc. v. Bratton, 95 F.3d 224, 231 (2d Cir.1996).
 
 
 57
 The Act's distinction between written and visual forms of expression, and its ban on lascivious expression contained in audio, video, and periodical materials, but not in books, are rationally related to a legitimate governmental interest. Congress could rationally have concluded that exchanges do not trade extensively in books containing sexually explicit material and that, consequently, it was unnecessary to include books under the Act's prohibition. Congress could also have rationally concluded that visual forms of lascivious expression are more prevalent, more likely to be noticed, or more provocative than written materials, and that accordingly there was a greater need to regulate such materials. See Williamson v. Lee Optical, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) ("The legislature may select one phase of one field and apply a remedy there, neglecting the others."); see also Railway Express Agency, Inc. v. New York, 336 U.S. 106, 110, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949) ("It is no requirement of equal protection that all evils of the same genus be eradicated or none at all."). Rational basis review does not pass judgment upon the wisdom, fairness, or logic of legislative decisions; it turns on whether there are "plausible" reasons for Congress's choices.[16] Beach, 508 U.S. at 313-14, 113 S.Ct. at 2100-02. Because there are rational justifications for the classifications created by the Act, the appellees' equal protection claim fails.
 
 
 58
 C. Vagueness Under the Due Process Clause of the Fifth Amendment
 
 
 59
 The district court also found the Act to be vague, in violation of the Due Process Clause of the Fifth Amendment. We disagree, believing that the district court here too was insufficiently sensitive to the particular context presented--namely, the specialized and strictly-regulated community of the armed forces.
 
 
 60
 The Due Process Clause requires that laws be crafted with sufficient clarity to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and to "provide explicit standards for those who apply them." Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972). The degree of linguistic precision that will satisfy these requirements, however, varies with the nature--and in particular, with the consequences of enforcement--of the statutory provision. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). For example, as the Supreme Court noted in a criminal obscenity case, "[t]he standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement." Winters v. New York, 333 U.S. 507, 515, 68 S.Ct. 665, 670, 92 L.Ed. 840 (1948); see also Village of Hoffman Estates, 455 U.S. at 498-99, 102 S.Ct. at 1193-94. At the same time, statutes that implicate constitutionally protected rights, including the freedoms protected by the First Amendment, are subject to "more stringent" vagueness analysis. Village of Hoffman Estates, 455 U.S. at 499, 102 S.Ct. at 1193-94.
 
 
 61
 These generally applicable standards, however, are modified in the military setting. We have recently reiterated the longstanding principle that "the [constitutional] tests and limitations to be applied may differ because of the military context," Able, 88 F.3d at 1294, and the Supreme Court has instructed us that substantial judicial deference is required in the military setting, see, e.g., Goldberg, 453 U.S. at 70, 101 S.Ct. at 2654-55. Specifically, the Court has stated that "[f]or the reasons which differentiate military society from civilian society ... Congress is permitted to legislate both with greater breadth and with greater flexibility when prescribing the rules by which the former shall be governed than it is when prescribing rules for the latter." Parker, 417 U.S. at 756, 94 S.Ct. at 2561-62.
 
 
 62
 Applying these principles to the Act before us, it is clear the statute may fall short of absolute linguistic precision and yet still comply with the requirements of the Due Process Clause of the Fifth Amendment. First, the Act carries with it no criminal penalties; in fact, it specifies no penalties at all. The "penalty" that appellees complain of is an indirect one: if the Act is enforced against military personnel and the Department of Defense (who are, after all, the entities who are barred from selling or renting sexually explicit materials), appellees will suffer the penalty of losing the government's assistance in (re)selling their wares. Appellees will lose their preferred retail outlets for members of the armed forces, but they are not prevented from selling and renting sexually explicit material directly to servicemembers. Second, the Act represents an exercise of Congress's constitutional power to prescribe "Rules for the Government and Regulation" of the armed forces, U.S. Const. art. I, § 8, cl. 14. As such it must be accorded the "greater breadth and greater flexibility" indicated by the Supreme Court in Parker. 417 U.S. at 756, 94 S.Ct. at 2562. And third, while the Act implicates expressive activity and thus warrants a more stringent vagueness analysis, Parker is again instructive. That case too involved expressive activity--a military officer's statements to other servicemembers--that was the basis for a conviction for, inter alia, "conduct unbecoming an officer and a gentleman." 417 U.S. at 738, 94 S.Ct. at 2553. Although it involved a direct penalization of speech, the Supreme Court accorded Congress "greater flexibility" and upheld the Uniform Code of Military Justice provision against a vagueness challenge. See id. at 756-57, 94 S.Ct. at 2561-62. Congress is entitled to that same flexibility here, where the penalties are far less direct or severe.
 
 
 63
 Measured by these guideposts, we conclude that the Act does not offend the Due Process Clause of the Fifth Amendment. Many of the terms employed in the Act, read in light of the explanatory directive implementing it, have been found by the courts to be sufficiently clear for constitutional purposes. And whatever ambiguity remains, if any, is constitutionally tolerable in light of the generous vagueness standard outlined above.
 
 
 64
 For example, the Supreme Court has rejected as "insubstantial" a claim that the term "lascivious" in a criminal statute was unconstitutionally vague. United States v. X-Citement Video, Inc., 513 U.S. 64, 78-79, 115 S.Ct. 464, 472, 130 L.Ed.2d 372 (1994). In doing so the Court explicitly adopted the view of the Court of Appeals for the Ninth Circuit that "lascivious" could be equated with "lewd," id., which the Ninth Circuit described as "a commonsensical term whose constitutionality was specifically upheld in Miller v. California [413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) ]." United States v. X-Citement Video, Inc., 982 F.2d 1285, 1288 (9th Cir.1992) (internal citation and quotation marks omitted), rev'd on other grounds, 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). The district court in the instant case nevertheless found vagueness in the adjective "lascivious" based on its determination that the word "contains a subjective element." General Media, 952 F.Supp. at 1083. We note that the same could be said for any number of the words which in combination make up our constitutional test for obscenity. See Miller, 413 U.S. at 24, 93 S.Ct. at 2614-15.[17] Other terms employed in the Act and its regulations are also familiar to the courts. The term "dominant theme," for example, has long been employed in First Amendment law. See, e.g., Roth v. United States, 354 U.S. 476, 489 & n. 26, 77 S.Ct. 1304, 1311 & n. 26, 1 L.Ed.2d 1498 (1957); United States v. Petrov, 747 F.2d 824, 830 (2d Cir.1984).
 
 
 65
 The question presented is not whether the Act or its terms include any ambiguity or "subjectivity"; in some expansive sense, all words contain a degree of imprecision and are unavoidably open to interpretation. The question is whether any ambiguity that does exist rises to the level of unconstitutional vagueness under the Due Process Clause of the Fifth Amendment. In light of the permissiveness of the scrutiny that we apply to this military regulation carrying only indirect, financial consequences, we hold that it does not.
 
 III.
 To summarize:
 
 66
 (1) In adopting the Act, Congress reasonably furthers legitimate governmental interests--inter alia, upholding military honor, professionalism, and proper decorum by eliminating the appearance of official endorsement inherent in the military's resale of the proscribed materials--and it does so in a nonpublic forum, without engaging in viewpoint discrimination. Accordingly, the Act does not violate the Free Speech Clause of the First Amendment.
 
 
 67
 (2) The Act's distinctions among the types of materials it regulates are rationally related to legitimate governmental interests. As a result, those distinctions do not run afoul of the equal protection guarantee of the Due Process Clause of the Fifth Amendment.
 
 
 68
 (3) The Act is sufficiently clear, in light of the appropriate level of scrutiny accorded to a military regulation carrying only indirect, civil penalties, to survive a vagueness challenge under the Due Process Clause of the Fifth Amendment.
 
 
 69
 Accordingly, the judgment of the district court is vacated and the cause is remanded with instructions to enter judgment for appellants.
 
 PARKER, Circuit Judge, dissenting:
 
 70
 Freedom of speech is one of those liberties which is so fundamentally essential to the preservation of a stable Government that the Government itself is generally prohibited from interfering with it, and as an Article III court, we are bound to protect it. But the power of Congress to "raise and support Armies" and "provide and maintain a Navy" under Article I, § 8, of the Constitution is also critical to the preservation of both a stable Government and to the protection of our liberties, of which the First Amendment is one. In cases of conflict, the balance is often struck in favor of protecting the military mission. This is true, not only with respect to strategic defense matters such as the protection of sailing dates and location of troops,[1] but also with respect to that part of the military mission directed toward the preparation of armies and navies "to fight or be ready to fight wars should the occasion arise," United States ex rel. Toth v. Quarles, 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955). " 'The armed forces depend of a command structure that at times must commit men to combat, not only hazarding their lives but ultimately involving the security of the Nation itself. Speech that is protected in the civil population may nonetheless undermine the effectiveness of response to command. If it does, it is constitutionally unprotected.' " Parker v. Levy, 417 U.S. 733, 759, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974) (quoting United States v. Gray, 20 USCMA 63, 42 C.M.R. 255 (1970)).
 
 
 71
 For these reasons, the Supreme Court has held that "judicial deference to such congressional exercise of authority is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." Rostker v. Goldberg, 453 U.S. 57, 70, 101 S.Ct. 2646, 2655, 69 L.Ed.2d 478 (1981). However, "deference does not mean abdication," id. "[M]en and women in the Armed Forces do not leave constitutional safeguards and judicial protection behind them when they enter military service." Weiss v. United States, 510 U.S. 163, 194, 114 S.Ct. 752, 769, 127 L.Ed.2d 1 (1994) (Ginsburg, J., concurring).[2] In short, the fact that the interests of the individual may sometimes be validly subordinated to " 'the needs of service,' " Goldman v. Weinberger, 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) (quoting Orloff v. Willoughby, 345 U.S. 83, 92, 73 S.Ct. 534, 539, 97 L.Ed. 842 (1953)), does not mean service members lose those rights whenever Congress, in exercising its power to raise armies, so desires. When First Amendment protection bows to the military's desire to suppress certain ideas without a clear and strong reason, desire to protect our liberties with a strong military authority may end up eroding our liberty to speak freely and to be tolerated in doing so.
 
 
 72
 The Military Honor and Decency Act of 1996, 10 U.S.C. § 2489a (the "Act"), prohibits "the sale or rental of sexually explicit material on property under the jurisdiction of the Department of Defense," which includes military exchanges. 10 U.S.C. § 2489a(a), (d)(2). The Act bans audio and video recordings, and periodicals with visual descriptions, produced in any medium, but does not ban purely written material. 10 U.S.C. § 2489a(d)(1). The term "sexually explicit material" is defined as material "the dominant theme of which depicts or describes nudity, including sexual or excretory activities or organs, in a lascivious way." Id. "Lascivious" is defined by the implementing regulations to mean "lewd and intended or designed to elicit a sexual response." Department of Defense Directive-Type Memorandum, "Sale or Rental of Sexually Explicit Material on DoD Property" (Dec. 22, 1996). This memorandum also establishes the "Resale Activities Board of Review," which has "the authority and responsibility to periodically review material offered or to be offered for sale or rental" at exchanges, and to determine whether such material is "sexually explicit" as defined by the memorandum. Id.
 
 
 73
 The court below granted appellee's request for permanent injunctive relief on the basis that the Act violated the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment. It reasoned that because the purpose of the Act was to ban expression that the government conceded was "offensive" and "because the First Amendment prevents the government from banning material solely because it is offensive," the Act was unconstitutional. The district court did not decide whether a military exchange is a public or nonpublic forum, nor whether the Act was viewpoint discriminatory. I agree with the majority that, as these issues are questions of law, we are equally well positioned to decide them. However, that is where my agreement with the majority ends. I would affirm the district court's opinion.
 
 I.
 
 74
 The Military Honor and Decency Act of 1996 does not prohibit the distribution of all sexually explicit material in military exchanges. Nor does it ban all depictions of nudity. Instead, it bars only the distribution of sexually explicit material, "the dominant theme of which depicts or describes nudity ... in a lascivious way." Because I believe this is viewpoint discrimination, and the government has failed to meet its burden of justification for this restriction on speech, I respectfully dissent.
 
 
 75
 The Act's definition of sexually explicit material includes within its scope much that is not encompassed within the Supreme Court's definition of "obscenity," which enjoys virtually no First Amendment protection. To be "obscene" under Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), a publication must (a) taken as a whole and applying contemporary community standards, appeal to the prurient interest, (b) contain patently offensive depictions or descriptions of specified sexual conduct, and (c) on the whole have no serious literary, artistic, political or scientific value. Id. at 24-25, 93 S.Ct. at 2614-16. See also Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 497, 105 S.Ct. 2794, 2798, 86 L.Ed.2d 394 (1985). The Act does not refer to the prurient interest or to the standards of the community. Nor does it require that the work lack literary, artistic, political or scientific value. The Act therefore covers both protected and unprotected speech. See also Sable Communications, Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment."). It is the protected speech that is addressed here.
 
 
 76
 It is axiomatic that the government may not restrict speech because of the message it conveys. Police Dept. v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972); see also Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819, 828, 115 S.Ct. 2510, 2516 (1995) ("In the realm of private speech or expression, government regulation may not favor one speaker over another."). Moreover, "[w]hen government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.... Viewpoint discrimination is thus an egregious form of content discrimination." Id.; see also Perry Educ. Ass'n v. Perry Local Educator's Ass'n, 460 U.S. 37, 62, 103 S.Ct. 948, 964, 74 L.Ed.2d 794 (1983) (Brennan, J., dissenting) ("Viewpoint discrimination is censorship in its purest form ..."). Even in a nonpublic forum, the government may not regulate speech in "an effort to suppress expression merely because public officials oppose the speaker's view." Perry, 460 U.S. at 46, 103 S.Ct. at 955; see also Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985) ("Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purposes of the forum ... the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.")[3]
 
 
 77
 As the majority points out, the distinction between content and viewpoint discrimination is not "a precise one." However, the majority's assertion that "lascivious" is an adjective identifying subject matter does not advance the inquiry: viewpoints and subject matters are both identified by some adjective--the question is whether the statute will skew one side of a debate. "Indecent" speech, or even "sexually explicit" speech, may be regarded as a category of speech, and the regulation of such speech is a content-based regulation. See Sable Communications, 492 U.S. at 126, 109 S.Ct. at 2836. To divide that category between depictions of nudity and other depictions, is yet another division, one step closer to viewpoint discrimination. But in banning distribution of only those depictions of nudity that are "lascivious," defined as "lewd and intended or designed to elicit a sexual response," the government is necessarily attempting to regulate a specific perspective--a point of view.
 
 
 78
 Portrayals of nude men and women designed to elicit a sexual response illustrate an idea: that lust or sexual desire is good, that men and women are sexual beings, or, if depicted in a submissive way, that women or men are submissive objects for humiliation or domination. Depictions of nude men and women in nonsubmissive ways, or in ways not designed to arouse, are permitted under the Act. This is, under relevant precedent, viewpoint discrimination. See, e.g., Lamb's Chapel v. Center Moriches Union Free School Dist.,, 508 U.S. 384, 394, 113 S.Ct. 2141, 2147-48, 124 L.Ed.2d 352 (1993) (denying permission to evangelical church to use school facilities to show a film about child rearing and family values solely because the film dealt with a subject from a religious perspective was viewpoint discriminatory when that subject had not been placed off limits to any and all speakers); American Booksellers Ass'n, Inc. v. Hudnut, 771 F.2d 323 (7th Cir.1985) (striking down an ordinance prohibiting trafficking in pornography, where pornography was defined as expressive material that depicts women as sexual objects, or as enjoying or deserving humiliation), aff'd mem., 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986); AIDS Action Comm. v. MBTA, 42 F.3d 1, 12 (1st Cir.1994) (holding that transit authority's refusal to accept advertisements regarding AIDS prevention for display in subway cars when it had allowed other sexually explicit material to be advertised which represented "the conventional exploitation of women's bodies" was viewpoint discrimination). It is no answer that the Act excludes such depictions of both men and women: the exclusion of "an entire class of viewpoints" is "just as offensive to the First Amendment as exclusion of only one." Rosenberger, 515 U.S. at 831, 115 S.Ct. at 2518. If multiple voices are silenced, the debate is simply skewed in multiple ways. Id.[4]
 
 
 79
 Nor is this form of expression any less deserving of protection because it may work through "inexpressible emotions," Cohen v. California, 403 U.S. 15, 26, 91 S.Ct. 1780, 1788-89, 29 L.Ed.2d 284 (1971). Just as words may be chosen for their emotive force, id., so too visual pictures can be chosen for their ability to arouse or offend. By restricting the sale of depictions which some viewers find offensive and others titillating, the government favors and protects the viewpoint of those offended and restrict the viewpoint of those who are titillated. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 2545, 105 L.Ed.2d 342 (1989).
 
 
 80
 Indeed, the government's defense of the statute unmasks the Act's viewpoint discrimination. The government asserts that the statute serves the government's interest in preserving "the military's image of honor, professionalism, and proper decorum." The underlying premise is that the military's distribution of depictions of nudity that are lewd or intended to elicit a sexual response are inconsistent with "honor, professionalism, and proper decorum." Yet the decision to ban distribution of such material strips military personnel of the right to decide for themselves whether such depictions are consistent with those values.[5] It even arguably denies them the right to determine which displays of nudity are lascivious.[6] "At the heart of the First Amendment lies the principle that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641, 114 S.Ct. 2445, 2458, 129 L.Ed.2d 497 (1994); see also Board of Educ. v. Pico, 457 U.S. 853, 867, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435 (1982) ("[T]he right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press and political freedom.").
 
 
 81
 Thus, the majority's claims that one does not "go about discussing and considering the political issues of the day from a lascivious viewpoint," is beside the point. It ignores the political issue of whether nonobscene, lascivious material, whatever form it may take, is necessarily inconsistent with the military's image of honor, professionalism and decorum, or the promotion of core values.
 
 
 82
 The majority's claim that the Supreme Court's dicta in R.A.V. v. City of St. Paul, 505 U.S. 377, 388, 112 S.Ct. 2538, 2546, 120 L.Ed.2d 305 (1992), that "[a] State might chose to prohibit only that obscenity ... which involves the most lascivious displays of sexual activity," authorizes the government to ban distribution of all lascivious portrayals of sexually explicit materials, ante at 281, is misguided for two reasons. Not only is nonobscene sexually explicit speech protected, unlike the obscene speech which is the subject of the Supreme Court's hypothetical, but to exclude only the most lascivious displays of sexual activity still allows in "the marketplace of ideas" the views expressed by lascivious displays of sexual activity, even if it prohibits the most extreme of those views.
 
 II.
 
 83
 Laws which favor one viewpoint over another are traditionally subjected to the highest level of scrutiny.[7] The question is whether, in reconciling the deference due Congress in military matters and our own constitutional responsibility, we must not only give deference to the military judgment as to the importance of the military interest, but must also lower the level of First Amendment scrutiny that would otherwise be applied.
 
 
 84
 In Parker, the Court upheld a court-martial conviction of an army captain for conduct designed "to promote disloyalty and disaffection among the troops" for publicly advocating that no "colored soldier" should go to Vietnam, and should refuse to fight if sent because they are discriminated against. 417 U.S. at 758, 94 S.Ct. at 2562-63. The Court stated:
 
 
 85
 While members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.
 
 
 86
 Id.
 
 
 87
 Thus, it is clear that, on a military base, some regulations[8] that restrict speech because of the message conveyed are permissible. But the speech in Parker was obviously central to the military mission: as the Supreme Court noted, while there was a possibility that the articles of the military code under which Levy was convicted could extend to conduct protected by the First Amendment, Levy's conduct, "that of a commissioned officer publicly urging enlisted personnel to refuse to obey orders which might send them into combat, was unprotected under the most expansive notions of the First Amendment." Id. at 761, 94 S.Ct. at 2564. Where the speech and the message conveyed are less harmful to the military mission, courts have declined to uphold the restriction. See, e.g., Schacht v. United States, 398 U.S. 58, 61-62, 90 S.Ct. 1555, 1558-59, 26 L.Ed.2d 44 (1970) (striking down a law making it a crime for an actor wearing a military uniform to criticize the conduct or policies of the Armed Forces, or say anything that would "tend to discredit" the military); Bryant v. Secretary of the Army, 862 F.Supp. 574, 584 (D.D.C.1994) (striking down portion of legislation prohibiting publication in Army newspaper of material "non in consonance" with Army policy).
 
 
 88
 In Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980), the Supreme Court considered a regulation which authorized an army base commander to exclude campaign literature (in the form of leaflets and pamphlets) from the base, when such literature presented a "clear danger to the loyalty, discipline, or morale" of the troops. Id. at 350, 100 S.Ct. at 597. The Court emphasized that the regulations "specifically prevent[ed] commanders from halting the distribution of materials that merely criticize the Government or its policies" and that under the regulations the Air Force commanders had no authority "to prohibit the distribution of the magazines and newspapers through regular outlets such as the post exchange newsstands." Id. at 355, 100 S.Ct. at 600.[9] The Court upheld the regulations because they "restrict[ed] speech no more than [was] reasonably necessary to protect the substantial government interest." Id. at 355, 100 S.Ct. at 600.
 
 
 89
 Last year this Circuit picked up the intermediate standard of review articulated in Brown v. Glines and stated in dicta that the test should be applied to content-based restrictions as well as content-neutral restrictions:
 
 
 90
 In the military context, however, as noted above, free speech rights are substantially diminished and the court's deference to the views of Congress and the military as to the need for speech restriction based on the requirements of discipline and readiness is high. Arguably, even a content-based restriction in the military context need only pass the test of Brown v. Glines.
 
 
 91
 Able v. United States, 88 F.3d 1280, 1296 (2d Cir.1996). Although I am not convinced that it is appropriate to take the further step of applying this intermediate standard of review to laws which discriminate on the basis of viewpoint, I do not need to decide that issue here. Even applying the intermediate standard of review in this case, the government has failed to meet its burden.
 
 III.
 
 92
 The government argues that pornography is "controversial and unpalatable to many" and that "Congress could therefore reasonably conclude that the exchanges' traffic in lascivious merchandise tarnishes the military's image of honor, professionalism, and proper decorum." It is, additionally, argued that the possible perception of military personnel that lascivious material sold at the base exchanged has been approved by the chain of command "subverts the military's goal of promoting core values." The government further claims that the Act is "narrowly tailored to prevent only the official condonation of this merchandise" because it leaves military personnel free to possess, view or listen to sexually explicit material either on or off base, and to acquire such material from private retailers through the mail or from each other if done unofficially.
 
 
 93
 The fact that Congress "could" have drawn such a conclusion, however, provides the Court no reason to conclude that Congress in fact did so, nor does it assist the inquiry whether a ban of distribution is necessary to protect the military's image. Significantly, the government offers no evidence, by way of congressional hearings, official reports, explicit congressional findings of fact, or military judgment to support its claims. Instead, the government urges us to accept its unsubstantiated post-hoc rationalization on the principle of judicial deference to congressional choice.
 
 
 94
 There is no question that "when evaluating whether military needs justify a particular restriction ... courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." Goldman, 475 U.S. at 507, 106 S.Ct. at 1313. This is not just because the military is a "specialized society separate from civilian society," and because the " 'rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty," Parker, 417 U.S. at 743-44, 94 S.Ct. at 2555-56 (quoting Burns v. Wilson, 346 U.S. 137, 140, 73 S.Ct. 1045, 1048, 97 L.Ed. 1508 (1953)), but because, as this Court in Able pointed out, "[a]s judges, we are 'ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have,' " 88 F.3d at 1293 (quoting Goldman, 475 U.S. at 507, 106 S.Ct. at 1313).
 
 
 95
 However, the precedents supporting judicial deference to military judgment have relied on substantial evidence of the types outlined above, to justify the infringement on the constitutional right at issue. See, e.g., Rostker, 453 U.S. at 72-74, 101 S.Ct. at 2655-57 (upholding, over an equal protection challenge, a regulation authorizing the President to require registration for military service of males but not females, deferring to extensive national attention and public debate, a report of the Senate Armed Services Committee, hearings held by both Houses and consideration by various other committees that "clearly establish[ed] that the decision to exempt women from registration was not the 'accidental by-product of a traditional way of thinking about females.' ") (quoting Califano v. Webster, 430 U.S. 313, 320, 97 S.Ct. 1192, 1196, 51 L.Ed.2d 360 (1977)); Able, 88 F.3d at 1285-86 (noting that extensive hearings were held in both houses of Congress on the issue of the military's treatment of homosexuals following Presidential directive to revise policy, and the Act itself contained 15 separate findings justifying Congress' decision to enact the "Don't ask, Don't tell" policy). See also Parker, 417 U.S. at 740-41, 94 S.Ct. at 2554-55 (noting that the district court relied on "the voluminous record of the military proceedings" and that "the military tribunals had given fair consideration [to appellee's claims]"). In this case, the only evidence the government offers in support of its arguments is the title of the Act.
 
 
 96
 I do not doubt that the government can lawfully enact statutes that promote the military's image of honor, professionalism, and proper decorum, or foster core values. It can, for example, validly prosecute military personnel for conduct "unbecoming an officer and a gentleman." See, e.g., Holley v. United States, 124 F.3d 1462 (Fed.Cir.1997) (upholding discharge of officer for taking drugs and contaminating sample for drug test). Conduct "unbecoming an officer and a gentleman" may even comprise speech. See, e.g., Parker, 417 U.S. at 738, 94 S.Ct. at 2553 (noting that Levy was also convicted for "wrongfully and dishonorably" making statements provoking disloyalty). The question is whether that is the substantial governmental interest that motivated Congress in this case. As the Supreme Court stated in Turner Broad. Sys.:
 
 
 97
 That the Government's asserted interests are important in the abstract does not mean, however, that the must-carry rules will in fact advance those interests. When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." It must demonstrate that the recited harms are real,not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.
 
 
 98
 512 U.S. at 664, 114 S.Ct. at 2470 (citations omitted).
 
 
 99
 As the district court found, there is no evidence on the record "to show that the actual sale or rental of sexually explicit material--as opposed to its possession--causes the alleged harm to the military's core values and appearance to the civilian world." On appeal, the government urges us to accept the mere possibility that military personnel might view sale of lascivious materials as official endorsement of such materials. Besides the fact that there is no evidence that this "risk" of perceived official endorsement is real, it defies common sense. Prior to the Act, local exchanges were directed to "[s]elect magazines based on merchandising considerations like consumer demand [and] shelf space." EOP Procedures, 40-11, Special Retail Programs, Chapter 10, § 10-2. Thus, the magazine selection reflect the views of the military personnel, not that of the government. Additionally, the military exchanges also sell alcohol and tobacco, and there is no suggestion that the military is regarded as endorsing drinking or smoking. And if the military still remained genuinely concerned about the mere possibility of the appearance of approval, it could easily place a sign above the materials stating that "The Military Disapproves The Sale Of All Sexually Explicit Material Depicting Nudity In A Lascivious Way."[10]
 
 
 100
 The majority's concern that "if sparseness of legislative history were a basis for invalidation of acts of Congress, a wide swath of legislation could fall before the judicial axe," ante at 283, is overstated. Clearly, lack of legislative history is not a basis on which to strike down an Act of Congress. In the first place the purpose of many legislative enactments and the manner in which the legislation furthers the purpose are obvious from their text. Furthermore, not every Act of Congress trammels on constitutional rights. When a legislature interferes with constitutional rights, however, it is neither unreasonable nor contrary to authority to require some sort of legislative determination that the infringement of the constitutional right was necessary to further the government interest advanced. See, e.g., Sable Communications, 492 U.S. at 129-30, 109 S.Ct. at 2838 (holding that a ban on indecent telephone messages violated the First Amendment, and noting that "aside form conclusory statements during the debates by proponents of the bill, as well as similar assertions in hearings on a substantially identical bill the year before, ... the congressional record presented to us contains no evidence as to how effective or ineffective the FCC's most recent regulations might prove to be"); Reno v. ACLU, --- U.S. ----, ---- n. 24, 117 S.Ct. 2329, 2338 n. 24, 138 L.Ed.2d 874 (1997) (holding that the "indecent transmission" and "patently offensive display" provisions of the Communications Decency Act of 1996 violated the First Amendment, the Court pointed to the fact that "[n]o hearings were held on the provisions that became law."). Cf. Giano v. Senkowski, 54 F.3d 1050, 1058-62 (2d Cir.1995) (Calabresi, J., dissenting).
 
 
 101
 In this case, the government simply advances post-hoc rationalizations which find no support in Congressional history or military consideration. To rely on the mere fact that a statute has been enacted as evidence of congressional judgment on the issue addressed in the Act, and assert that a court should give deference to that judgment because it involves a matter of military concern, would mean that no regulation in the military context that infringes on constitutional rights would ever be struck down. Enactment of the legislation would be sufficient by itself to support its validity. If this is "deference to congressional choice," Rostker, 453 U.S. at 67, 101 S.Ct. at 2653, then we have failed to heed the Supreme Court's warning that "deference does not mean abdication," id. at 70, 101 S.Ct. at 2655, and have failed to fulfill "our ultimate responsibility to decide the constitutional question," id. at 67, 101 S.Ct. at 2653, and to protect the liberties which our Constitution guarantees. I, therefore, respectfully dissent.
 
 
 
 [1]
 Military exchanges may include retail stores, garages, restaurants, beauty shops, laundry facilities, newsstands, storage facilities, and recreational facilities. The exchanges are authorized to sell toiletries, stationery, clothing, jewelry, housewares, sporting goods, and automotive products, in addition to books, periodicals, and audio and video tapes. Joint App. at 127, 133-45, reproducing DoD Directive 1330.9 (Dec. 15, 1986)
 
 
 [2]
 The First Amendment to the United States Constitution provides in pertinent part: "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const. amend. I
 
 
 [3]
 The Due Process Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "No person shall ... be deprived of life, liberty, or property, without due process of law...." U.S. Const. amend. V
 
 
 [4]
 A Department of Defense "Directive" is defined as a "broad DoD policy document containing what is required by legislation, the President, or the Secretary of Defense to initiate, govern, or regulate actions or conduct by the DoD." Joint App. at 70, reproducing DoD Directive 5025.1-M, "DoD Directives System Procedures" (Aug. 15, 1994). A "Directive-Type Memorandum" is a document that, "because of time constraints, cannot be published in the DoD Directives System"; such a memorandum is later converted into a directive or instruction. Id
 
 
 [5]
 An amended opinion and order, substantially identical in its holdings and statements of law, was entered on February 25, 1997
 
 
 [6]
 In designated public forums whose use is limited to particular purposes or speakers, restrictions on speech within those limits need only be reasonable and viewpoint neutral. See Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 829, 115 S.Ct. 2510, 2516-17, 132 L.Ed.2d 700 (1995); Travis v. Owego-Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir.1991) (in limited public forum, a "sub-category of the designated forum," once government "allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre"); Deeper Life Christian Fellowship, Inc. v. Bd. of Educ., 852 F.2d 676, 679-80 (2d Cir.1988)
 
 
 [7]
 It is unclear whether appellees contend that the exchanges are "limited public forums" in the sense that this Court has used the term--that is, as a "sub-category" of the "designated" public forum, in which the government may place blanket exclusions on certain types of speech, but may not discriminate unreasonably or on the basis of viewpoint among instances of those types of speech that have not been excluded, see Travis, 927 F.2d at 692, or that the exchanges are fully open designated public forums, in which content restrictions on speech are subjected to strict scrutiny, see Lee, 505 U.S. at 678, 112 S.Ct. at 2705. See Appellees' Brief at 28-29 (arguing that Act is subject to strict scrutiny because exchanges are "designated as limited public fora"). The question is irrelevant, however, in light of our holding that military exchanges are nonpublic forums
 
 
 [8]
 The district court stopped short of the issue of viewpoint discrimination, and also of a holding on the nature of the forum, because it found that the Act did not promote a legitimate governmental interest. As these issues are questions of law, we are equally well positioned to decide them. Furthermore, in cases raising First Amendment issues we have "an obligation to 'make an independent examination of the whole record.' " Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964))
 
 
 [9]
 See Perry, 460 U.S. at 48-49, 103 S.Ct. at 956-57 (noting Seventh Circuit's application of strict scrutiny to viewpoint discrimination in nonpublic forum, Perry Local Educators' Ass'n v. Hohlt, 652 F.2d 1286, 1295-97 (7th Cir.1981), while proceeding on other grounds); Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 394, 113 S.Ct. 2141, 2148, 124 L.Ed.2d 352 (1993) (stating, in context of nonpublic forum where restriction on speech was held to be viewpoint-discriminatory, that "the interest of the State in avoiding an Establishment Clause violation may be a compelling one justifying an abridgement of free speech" (internal quotation marks omitted)); cf. R.A.V. v. St. Paul, 505 U.S. 377, 391-92, 112 S.Ct. 2538, 2547-48, 120 L.Ed.2d 305 (1992)
 
 
 [10]
 Another, related approach to what is meant by "viewpoint discrimination" also supports our conclusion. The Supreme Court's decisions dealing with viewpoint discrimination evidence particular hostility to restrictions specifically intended to suppress the circulation of the arguments on one side of a particular debate. See, e.g., Lamb's Chapel, 508 U.S. at 393, 113 S.Ct. at 2147 (finding viewpoint discrimination where school "permit[ted] school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint"); R.A.V., 505 U.S. at 384, 112 S.Ct. at 2543 (government may not "proscrib[e] only libel critical of the government"), 505 U.S. at 388, 112 S.Ct. at 2546 (government may criminalize threats of violence against the President, but not "only those threats ... that mention his policy on aid to inner cities"). Yet laws that restrict the dissemination of defined kinds of expression for reasons that stop well short of suppression of speech are less likely to be found constitutionally offensive on viewpoint grounds. See, e.g., Perry, 460 U.S. at 49, 103 S.Ct. at 957 (finding no viewpoint discrimination where school allowed use of internal mail system by one union but not by rival union where reason for distinction was respective status of unions); Lehman, 418 U.S. at 304, 94 S.Ct. at 2717-18 (plurality opinion) (upholding, without any mention of viewpoint discrimination, city policy not to accept political advertisements on public transit system where reason for policy was to avoid appearance of favoritism). The statute at issue here falls into the latter category--it is apparently directed not to suppressing, but to disassociating the military from, appellants' speech. The Act prohibits the military-sponsored sale or rental of sexually explicit materials, but it does not suppress the private purchase, circulation, receipt, or possession of such materials on military property. By this reading too, then, the Act does not offend the prohibition against viewpoint discrimination
 
 
 [11]
 We cite the Act's gender neutrality not because it establishes the Act's viewpoint neutrality, but because it suggests that the appellees' own definition of the viewpoint allegedly under attack ("women as sexual beings") is contrary to the plain language of the statute
 
 
 [12]
 We recognize, as the district court pointed out, that the language quoted is addressed to obscene speech, which is largely unprotected by the First Amendment, while speech that receives the protection of the First Amendment is at issue in this case. This does not mean, however, that the R.A.V. opinion and its logical implications are irrelevant to protected speech. To the contrary, R.A.V. provides that the First Amendment's prohibition against viewpoint discrimination applies to both protected and unprotected speech. 505 U.S. at 383-84, 391-92, 112 S.Ct. at 2543, 2547-48. The inference we draw from R.A.V. (above) that prurience and patent offensiveness are not viewpoints should similarly apply to both protected and unprotected speech
 
 
 [13]
 In particular, appellees and amici focus considerable attention on the public statements of various legislators during and after the Act's passage, from which we are apparently asked to divine the true purpose of the measure. However, the motivations of individual legislators, to the extent we may be able to discern them, are not dispositive. As the Court of Appeals for the Ninth Circuit has recognized, "remarks of a legislator, even those of the sponsoring legislator, will not override the plain meaning of a statute." United States v. Tabacca, 924 F.2d 906, 911 (9th Cir.1991) (emphasis supplied). We agree. Even where the meaning of a statute would benefit from exposition, legislators' pre-passage remarks are not presumptively conclusive. Furthermore, the post-passage press release of an individual legislator, upon which appellees rely, cannot be accorded any significance or weight
 
 
 [14]
 We also note that the government's interest in disassociating itself from sexually explicit materials may be enhanced by the military's role as an employer. Military installations are workplaces for the civilian and military personnel assigned there; like private sector employers, the military may have an interest in maintaining a workplace environment that is efficient and focused on the task at hand--not one littered with materials that are "intended or designed to elicit a sexual response," DoD Directive-Type Memorandum (Dec. 22, 1996)
 
 
 [15]
 The dissent argues that this objective, the government's promotion of military honor, professionalism, and proper decorum, as defined by Congress and the military, is itself proof that the Act is viewpoint discriminatory. This is so, according to the dissent, because the government's determination that the sale of lascivious materials is inconsistent with these military values deprives individual soldiers of "the right to decide for themselves whether such depictions are consistent with those values." Post at 291. Apparently, then, the military may not promote or enforce its own definition of honor, professionalism, and proper decorum, because if it does so, thereby trumping a soldier's own definitions of those terms, it will be engaging in unconstitutional viewpoint discrimination. We think this cannot be the case: surely, for example, the military could decide that bigotry is inconsistent with military professionalism and proper decorum, not to mention honor, and could promote that definition, overriding individual soldiers' opinions to the contrary. Indeed, the dissent itself asserts that it "do[es] not doubt that the government can lawfully enact statutes that promote the military's image of honor, professionalism, and proper decorum, or foster core values." Post at 294
 
 
 [16]
 We note that the absence of "Congressional findings of fact ... and evidence on the record" in support of these distinctions, General Media, 952 F.Supp. at 1082, has no bearing on our analysis. See Nordlinger v. Hahn, 505 U.S. 1, 15, 112 S.Ct. 2326, 2334, 120 L.Ed.2d 1 (1992) (equal protection "does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification"). It is even irrelevant "whether the conceived reason for the challenged distinction actually motivated the legislature" so long as there is a "plausible reason[ ] for Congress' action." Beach, 508 U.S. at 313-15, 113 S.Ct. at 2100-02 (internal quotation marks omitted)
 
 
 [17]
 Miller specifies that "works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value" may be regulated as legally obscene. 413 U.S. at 24, 93 S.Ct. at 2615
 
 
 [1]
 In a time of war, for example, "[n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops." Near v. Minnesota ex rel. Olson, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931)
 
 
 [2]
 See also Goldman v. Weinberger, 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) ("These aspects of military life [obedience and unity] do not, of course, render entirely nugatory in the military context the guarantees of the First Amendment."); United States v. Robel, 389 U.S. 258, 264, 88 S.Ct. 419, 423, 19 L.Ed.2d 508 (1967) (" 'Even the war power does not remove constitutional limitations safeguarding essential liberties' ") (citations omitted)
 
 
 [3]
 Since I conclude that the Act is viewpoint discriminatory, I do not need to decide, and express no view on, whether a military exchange on a military base constitutes a traditional or "designated" public forum or a nonpublic forum
 
 
 [4]
 Thus, the majority's allusion to the fact that the Act does not reference gender does not alter the statute's viewpoint discriminatory characterization
 
 
 [5]
 The fact that this decision is removed from the potential consumers and rests entirely in the discretion of the Resale Activities Board of Review increases the danger that the government is censoring viewpoints. As the Supreme Court stated in City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 763, 108 S.Ct. 2138, 2147, 100 L.Ed.2d 771 (1988):
 [A] law or policy permitting communication in a certain way for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official.
 
 
 [6]
 I disagree with the majority's assertion that this argument would prevent the military from enforcing its own definition of honor, professionalism and decorum, such as by deciding that bigotry is inconsistent with those goals, ante at 276. The fact that the government could present a valid military interest to justify regulation of bigotry within the military does not alter the analysis of whether such regulation is viewpoint discriminatory in the first instance. As noted below, post at 281 n. 8, it is clear that the military can, in certain circumstances, prohibit expression because of the message conveyed. To do so, however, it must also show how conveyance of the message will interfere with performance of the military mission
 
 
 [7]
 As the majority notes, the Supreme Court has at least twice noted without disapproval Circuit Courts' application of strict scrutiny review to viewpoint discrimination. See Perry, 460 U.S. at 48-49, 103 S.Ct. at 956-57 (holding that the exclusion of rival union from teachers' internal mail system was viewpoint neutral and therefore valid); Lamb's Chapel, 508 U.S. at 394, 113 S.Ct. at 2147-48 (holding a law invalid as viewpoint discriminatory); see also R.A.V., 505 U.S. at 431, 112 S.Ct. at 2569 (Stevens, J., concurring) ("[V]iewpoint-based restrictions of expression require greater scrutiny that subject-matter-based restrictions."). However, the view that viewpoint discrimination is per se unconstitutional has also been expressed. See, e.g., R.A.V., 505 U.S. at 392, 112 S.Ct. at 2548 (Scalia, J., for the Court) ("[The City] has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.")
 
 
 [8]
 The article of the Military Code under which Levy was convicted extended to " '[c]ertain disloyal statements by military personnel,' " and was intended to cover viewpoint-based speech: " '[e]xamples are utterances designed to promote disloyalty or disaffection among troop, as praising the enemy, attacking the war aims of the United States, or denouncing our form of government.' " Parker, 417 U.S. at 753, 94 S.Ct. at 2560 (quoting the Manual for Court's Martial 213c (1969))
 
 
 [9]
 The Court also noted a Department of Defense Directive that advised commanders to "preserve servicemen's 'right of expression ... to the maximum extent possible, consistent with good order and discipline and the national security.' " Id. at 355, 100 S.Ct. at 600
 
 
 [10]
 The majority also points to the military's interest as an employer in "disassociating itself from sexually explicit material," ante at 284. While I do not doubt that an employer, including the government, could prohibit the display of sexually explicit material in a working environment so pervaded with discriminatory harassment as to alter the conditions of employment and create an abusive working environment, see Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405-06, 91 L.Ed.2d 49 (1986), the government did not come forward with any evidence that the military constitutes a hostile environment, and, even if it did, the Act does nothing to prohibit the display of such material