**PMG INTERNATIONAL DIVISION, LLC, et al., Plaintiffs,**

v.

**William S. COHEN, et al., Defendants.**

**No. C–98–21138–JF.**

United States District Court,
N.D. California,
San Jose Division.

July 13, 1999.

See also 131 F.3d 273.

Sonnenschein Nath & Rosenthal, by Michael A. Bamberger, New York City, Sonnenschein Nath & Rosenthal, by Peter A. Smalbach, San Francisco, CA, Goldstein, Goldstein and Hilley, by Gerald H. Goldstein, Cynthia Hujar Orr, San Antonio, TX, for the plaintiffs.

U.S. Department of Justice Civil Division, by David O. Buchholz, Washington, DC, for the defendants.

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

FOGEL, District Judge.

Plaintiffs seek a preliminary injunction which would bar defendants from enforcing 10 U.S.C § 2489a, a statute also known as "The Military Honor and Decency Act." For the reasons set forth herein, plaintiffs' motion will be denied.

### I. BACKGROUND

The subject legislation (hereinafter, "the Act") was enacted by Congress in 1996. Subsection (a) of the Act provides that "[t]he Secretary of Defense may not permit the sale or rental of sexually explicit material on property under the jurisdiction of the Department of Defense." Subsection (b) provides that "[a] member of the armed forces or a civilian officer or employee of the Department of Defense acting in an official capacity may not provide for sale, remuneration, or rental sexually explicit material to another person." Subsection (c) directs the Secretary of Defense to develop regulations to implement the Act. Finally, subsection (d) defines the terms "sexually explicit material" and "property under the jurisdiction of the Department of Defense."

Before the Act took effect, the publisher of *Penthouse* magazine and other periodicals, as well as several trade associations representing businesses engaged in the production, distribution, and sale of periodicals, books, sound recordings and videos, sought to enjoin its enforcement. The United States District Court for the Southern District of New York concluded that the Act violates the First and Fifth Amendments to the Constitution and entered a permanent injunction. *See General Media Communications, Inc. v. Perry,* 952 F.Supp. 1072 (S.D.N.Y.1997). In a 2–1 decision, the Second Circuit reversed. *See General Media Communications, Inc. v. Cohen,* 131 F.3d 273 (2nd Cir.1997) ("*GMC* "). The Act is now in effect.

The entity plaintiffs in the present action are magazine wholesalers which previously supplied certain now-banned magazines to military exchanges. The individual plaintiffs are military personnel, dependents, and civilian employees of the military who assert a right to purchase now-banned materials at military exchanges[1]. Plaintiffs are represented by the same counsel who represented the plaintiffs in *GMC*. Plaintiffs challenge the constitutionality of the Act on the same grounds as were raised in *GMC* with additional arguments relating to the way the Act is being implemented and to the fact that plaintiffs now include not only publishers and distributors but also individuals who wish to receive the communications in question.

## II. DISCUSSION

### A. Constitutionality

It is important at the outset to emphasize what is *not* at issue in the present case. The fundamental question before the Court is *not* whether members of the armed services have a constitutional right to read or watch sexually explicit materials. As was noted by the Second Circuit majority in *GMC*:

> Congress has not banned sexually explicit magazines and videos—soldiers and sailors may still buy them elsewhere, receive them by mail, and read or watch them; Congress has decided only that the military *itself* will not be in the business of selling or renting these items to servicemembers.

131 F.3d at 275.

Both the majority and the dissenting opinions in *GMC* analyzed the facial constitutionality of the Act in light of traditional free speech doctrine, according to which

the degree to which First Amendment protections are implicated by restrictions on speech depends upon the type of forum in which the speech occurs and whether the restrictions are based upon the content or the viewpoint of the speech. The language quoted above, however, highlights what this Court believes to be the critical issue in the case before it: do plaintiffs' First Amendment rights include the right to have *the government* disseminate particular types of speech? While most often the governmental regulation at issue in a free speech case is aimed at restricting the right of *citizens* to publish or distribute certain materials, in this case the government has restricted *itself* from engaging in such activity.

Defendants rely heavily upon *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998), a case decided after *GMC*. In *Forbes*, an independent political candidate was excluded from a debate sponsored and televised by a public television station. In analyzing whether the exclusion violated the candidate's constitutional rights, the Supreme Court first considered "whether public forum principles apply to the case at all." *Id.* at 1639. The Court concluded that as a *general* rule public broadcasting "does not lend itself to scrutiny under the forum doctrine." *Id.* at 1640. Although in reaching this conclusion the Court identified certain policy considerations specifically associated with public broadcasting which are not present here,[2] *Forbes* nonetheless plainly stands for the proposition that some channels of communication simply are not fora at all.

Applying the rationale of *Forbes* to the facts of the present case, this Court concludes that military exchanges are one such channel of communication. The *Forbes* court noted that "[w]hen a public

---

**1.** Some of these individuals assert that because they are stationed at remote locations, military exchanges are their only potential source of such materials other than mail order.

**2.** Conversely, this case presents at least one policy consideration not present in *Forbes* which weighs significantly in favor of defendants: judicial deference to congressional authority to regulate the military. *See GMC*, 131 F.3d at 275.

broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity." *Id.* at 1639. Likewise, here, when military exchanges purchase and offer for sale various publications, they are engaging in speech activity. While plaintiffs clearly have a constitutional right to engage in or listen to non-obscene speech, they have no constitutional right to compel the government to facilitate or participate in the making or communication of such speech.[3]

At oral argument, plaintiffs agreed that military exchanges are not obligated to purchase or offer for sale any particular publication. They also virtually conceded that prior to the implementation of the Act, military exchange organizations appropriately could have exercised "editorial discretion" to exclude the publications at issue here from being sold at some or all military exchanges. Plaintiffs contend, however, that by enacting a categorical ban on the sale and distribution of sexually explicit materials and delegating the task of defining what is and is not sexually explicit to a national review board, Congress has precluded the exercise of discretion at the local level, and that this preclusion amounts to an impermissible, arbitrary restriction of plaintiffs' constitutional rights.

The Court believes that this aspect of plaintiffs' challenge to the Act is founded upon an artificial distinction among levels of authority within the government. Regardless of who makes the decision, ultimately it is the government *as such* which is engaging in speech activity by offering publications for sale or rental at military exchanges. While Congress in the past may have permitted some editorial deci-

sions to be made at lower levels of authority, that historical fact does not preclude it from deciding to exercise authority over what types of speech activity the government will conduct in the future.

*Board of Education, Island Trees Union Free School Dist. No. 26 v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), relied upon by plaintiffs, does not compel a different result. First, *Pico* establishes no controlling law, as none of the opinions therein commanded a majority. Second, even the plurality opinion expressly limits its application to the situation where a school *removes* certain books from library shelves rather than fails to purchase particular books. *See* 457 U.S. at 871–72, 102 S.Ct. 2799. It is difficult to apply this limitation to the facts here: while the exchanges obviously have removed certain periodical *titles* (and presumably any then-existing copies) from their shelves, on an ongoing basis they simply are refusing to *acquire* new publications. Finally, all of the opinions in *Pico* (except one which declined to reach constitutional issues) turn on factors unique to the educational setting.

The Court does not suggest that there are *no* constitutional limits on the government's choices as to its own participation in the speech of others. Where public property is a traditional or designated public forum, the government is limited as to what restrictions it can impose, despite the fact that the government is, in effect, subsidizing the speech and participating in it by giving speakers use of the public property.[4] Further, as *Forbes* makes clear, at least in the context of broadcast political debates, where the government offers its resources to third parties for transmission of those parties' communica-

---

**3.** This would appear to be true even as to those individual plaintiffs who assert that military exchanges are their only potential source of the materials in question other than the mail. None of the legal authorities cited by the parties suggest that the government has an affirmative obligation to ensure that individual service members receive any particular type of publication.

**4.** Although this Court does not believe that analysis under forum doctrine is necessary or applicable in light of *Forbes,* if it were this Court would agree with the majority in *GMC* that a military exchange is neither a traditional nor a designated public forum for purposes of First Amendment analysis.

**920**

tions "with minimal intrusion" by the government, the government may not engage in viewpoint discrimination even in a private forum. *See id.* at 1640; *see also Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 834, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (holding that if university "expends funds to encourage a diversity of views from private speakers" then university's right to control its "own speech" not at issue.)[5] In these types of cases, however, the essence of what the government is being asked to do is to step back and allow the third parties to use the government property without interference; the government is *not* being asked to become part of the distribution chain from an author or producer to the end reader or viewer.[6]

One can envision additional constitutional limitations. For instance, the govern-

ment could not constitutionally use its own speech to drown out the speech of others. *See Forbes,* 118 S.Ct. at 1646 (Stevens, J., dissenting) (discussing risks posed by governmental propaganda). Nor could Congress prohibit the sale of materials at military exchanges on the basis of race, gender, national origin or similar impermissible criteria, without its legislation being subject to a successful challenge on equal protection grounds. No such issue, however, is presented here.[7]

The Court concludes that the First Amendment does not compel the government to offer sexually explicit materials for sale or rental at military exchanges.[8] Accordingly, plaintiffs' arguments that the Act is being enforced with "prior restraints," arbitrarily and without adequate procedural safeguards necessarily fail.[9]

5. Again, although forum doctrine does not apply, the Court is not persuaded by plaintiffs' argument that the Act imposes viewpoint-based restrictions on speech. The evidence in the record shows that military exchanges continue to distribute sexually-oriented materials as long as the content of such materials is not sexually explicit. Plaintiffs appear to be contending that the inclusion of sexually explicit content in a magazine or video amounts to the expression of a viewpoint, thus implicating stricter First Amendment scrutiny. In this sense, however, virtually *any* content also could be characterized as viewpoint: for example, the inclusion in a magazine of an article about rock-climbing could be said to express a viewpoint that rock-climbing is an activity worthy of attention.

6. The Court acknowledges that the public broadcaster does in a sense "distribute" the communications in a political debate; the Supreme Court, however, carved its "narrow exception" in which forum analysis does apply by emphasizing the dissociation between the broadcaster and the views expressed. *See Forbes,* 118 S.Ct. at 1640. Likewise in *Rosenberger,* the Court emphasized the dissociation between the university and the publications in issue. *See* 515 U.S. at 834–35, 115 S.Ct. 2510. While the dissent in *GMC* suggested that the military could take steps to clarify it was not endorsing the publications at issue here, *see* 131 F.3d at 294, the government would still be in the position of actively distributing the communications in a factual set-

ting fundamentally different from those in *Forbes, Rosenberger,* and other public and designated public forum precedents.

7. Although plaintiffs argue a deprivation of equal protection, they do not assert that they are members of any protected class. Accordingly, the distinctions the law makes need survive only a rational basis analysis. The Court concludes the Act passes that test for the reasons set forth in *GMC,* 131 F.3d at 285–86.

8. The Court notes that subsection (a) of the Act arguably extends to conduct which would not fall under the preceding analysis because it appears to forbid the sale by any person on military property of material which may not be obscene, regardless of whether that person is acting in an official capacity. Thus, if one servicemember were to sell a collection of old *Penthouse* magazines to another servicemember, there could be a violation of the Act (assuming *Penthouse* is within the definitions of the Act). Plaintiffs have not suggested that the Act is being enforced against any such conduct or any other equivalent conduct not involving direct governmental involvement in the speech. Accordingly, the Court does not reach the issue of whether the Act constitutionally could be applied to bar such conduct.

9. The Court rejects plaintiffs' due process challenges for the reasons set forth in *GMC,* 131 F.3d at 286–87.

## B. Procedural posture

In *GMC*, the parties agreed at the trial court level to treat the plaintiffs' application for a preliminary injunction as one for a permanent injunction. *See* 131 F.3d at 277; Fed.R.Civ.P. 65(a)(2). Thus, both the district court's decision and the Second Circuit's decision were on the merits. Here, in contrast, only an application for a preliminary injunction is before the Court. Nevertheless, the parties have briefed and argued the matter by focusing on the merits, rather than the sliding scale of irreparable harm and the probability of success. *See Roe v. Anderson,* 134 F.3d 1400, 1401–02 (9th Cir.1998).

The Court likewise has articulated the foregoing analysis as if it were *deciding* the constitutionality of the Act. In fact, however, in the present procedural setting, the Court cannot make and has not made a definitive ruling that the Act or its application is constitutional; rather, it has concluded that based on the preceding analysis, plaintiffs have not shown the requisite degree of probability of success on the merits to warrant a preliminary injunction, even assuming a high degree of irreparable harm.[10]

### III. ORDER

Plaintiffs' motion for a preliminary injunction is denied. The parties shall appear for a case management conference on September 13, 1999, at 10:30 a.m.

---

**10.** Obviously, the parties could stipulate that this order constitutes a decision on the merits to expedite appellate review.