In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1230

COURTHOUSE NEWS SERVICE,

*Plaintiff-Appellee,*

*v.*

DOROTHY BROWN, in her official capacity
as Clerk of the Circuit Court of
Cook County, Illinois,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-CV-7933 — **Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 14, 2018 — DECIDED NOVEMBER 13, 2018

Before BAUER, HAMILTON, and SCUDDER, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff-appellee Courthouse
News Service ("CNS") seeks injunctive relief under 42 U.S.C.
§ 1983, arguing that the First Amendment requires Dorothy
Brown, Clerk of the Circuit Court of Cook County, Illinois, to
release newly filed complaints to the press at the moment of
receipt by her office—not after processing. Neither the Court

of Appeals for the Seventh Circuit nor the Supreme Court of the United States provides the press with this sort of instant access to court filings.[1] Instead, in our court and apparently in the Supreme Court, as well, the clerks' offices undertake certain administrative processing before a filing is made publicly available, giving our practices a similarity to the practices in state court challenged in this case. That fact would make it unusual, and perhaps even hypocritical, for us to order a state court clerk to provide such instant access on the basis of the same Constitution that applies to federal courts. Adhering to the principles of equity, comity, and federalism, we conclude that the district court should have abstained from exercising jurisdiction over this case. See *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974); *Rizzo v. Goode*, 423 U.S. 362, 379–80 (1976); *SKS & Associates, Inc. v. Dart*, 619 F.3d 674, 678–80 (7th Cir. 2010). We therefore reverse the district court's order granting a preliminary injunction and order this action dismissed without prejudice.

---

[1] This court's Electronic Case Filing Procedures provide: "A brief, appendix and petition for rehearing (and any answer filed thereto) will be considered timely once it is submitted to the court's electronic filing system. It will be considered filed on the court's docket only after a review for compliance with applicable rules, acceptance by the Clerk, and issuance of a Notice of Docket Activity." Available at http://www.ca7.uscourts.gov/ecf/ECFprocedures.htm.

The Supreme Court's Guidelines for the Submission of Documents to the Supreme Court's Electronic Filing System provide: "Filings that initiate a new case at the Supreme Court will be posted on the Court's website only after the Clerk's Office has received and reviewed the paper version of the filing, determined that it should be accepted for filing, and assigned a case number." Available at https://www.supremecourt.gov/filingandrules/ElectronicFilingGuidelines.pdf.

I. *Factual & Procedural Background*

CNS is a news service with hundreds of reporters and editors who cover civil litigation in thousands of state and federal courthouses across the country. In addition to writing and publishing articles, CNS reporters compile "New Litigation Reports," which contain summaries of newsworthy new civil complaints. Before the advent of electronic filing systems, CNS reporters would go to clerks' offices in courthouses and review paper copies of complaints in person. With the shift to electronic filing, things have become more complicated.

In the past, the Cook County Clerk's Office ("Clerk's Office") allowed reporters to have same-day access to newly filed paper complaints by placing copies in a tray behind the intake counter. Electronic filing began in 2009, and until 2015, the Clerk's Office would simply print out electronically filed complaints as they were received and allow reporters to view them along with the paper complaints. In January 2015, the Clerk's Office stopped printing electronically filed complaints and started withholding them until administrative processing was completed and they were officially accepted. Now, reporters cannot view electronically filed complaints until they are processed and posted online. This leads to delays in access.

CNS and the Clerk characterize the delays differently. CNS contends that almost 40% of electronically filed complaints are not accessible on the same day they are filed. By contrast, the Clerk contends that 90.9% of electronically filed complaints are publicly available within one business day; 94.7% within two business days; and 96.8% within three business days. Some of the delays are the result of nothing more

than the normal business hours of the Clerk's Office. If a complaint is filed right before the Clerk's Office closes for the day, it likely will not be available until the next day. Weekends also lead to longer delays. If a complaint is filed Friday evening, it will not be available until Monday when the Clerk's Office re-opens and has time to process it. While the delays can be framed differently, the parties seem to agree that the thrust of this dispute concerns CNS's displeasure with a delay of no more than one business day in access to the vast majority of electronically filed complaints.

An Illinois Supreme Court order made electronic filing mandatory in the Cook County Circuit Court as of July 1, 2018. In advance of this effective date, CNS contacted Clerk Brown's office and proposed various options that would allow the press to obtain quicker access to electronically filed complaints. The Clerk pushed back and explained that electronically filed complaints are not considered received or filed until they have been processed and accepted. She pointed to Cook County Circuit Court General Administrative Order No. 2014-02 ("Order No. 2014-02") and the Illinois Supreme Court's Electronic Filing Standards and Principles ("Illinois Standards"), which both state that electronically submitted documents shall be considered filed "if not rejected" by the Clerk's Office. The Clerk interprets these orders as mandating an "accept/reject" process before complaints are released to the press.[2] The Clerk informed CNS that the policies and procedures would remain the same.

---

[2] The district court did not interpret these orders as mandating an "accept/reject" process before release. See *Courthouse News Service v. Brown*, No. 17 C 7933, 2018 WL 318485, at *3 (N.D. Ill. Jan. 8, 2018) ("Brown points to nothing in Order No. 2014-02 or in the Electronic Filing Standards and

When talks with the Clerk's Office did not produce the desired changes, CNS brought this action in November 2017. CNS moved for a preliminary injunction prohibiting the Clerk from processing electronically filed complaints before allowing press access. The motion was submitted on the affidavits, and no evidentiary hearing was held. The Clerk opposed the motion but did not dispute that a First Amendment presumption of access to documents filed in court applies to civil complaints. She instead argued that the presumption does not require immediate access, that the delays here are insignificant, and that the First Amendment is not being violated. The Clerk explained that the "accept/reject" process is important because if complaints were released to the press before processing, confidential information contained therein could be exposed.[3] The Clerk also explained that confusion may result

Principles that requires her to accept or reject or otherwise process e-filed complaints prior to making them available to the public in some form. Instead, Brown simply asserts that Order No. 2014-02 and the Electronic Filing Standards and Principles provide that the complaints are not 'filed' until accepted."); *id*. at *5 ("Brown contends that she is justified in withholding e-filed complaints from the public and the press until after processing because both Order No. 2014-02 and the Electronic Filing Standards and Principles provide that electronically submitted documents shall be considered filed 'if not rejected' by the Clerk. Order No. 2014-02 at 3; Electronic Filing Standards and Principles at 1. But as the Court has discussed, Brown points to nothing that would require her to delay access to e-filed complaints until after they are processed and officially accepted."). We read these orders differently and agree with Brown: these orders do require an "accept/reject" process before release. In any event, as we explain below regarding abstention, the Illinois state courts are best situated to interpret their own orders and to decide how important the "accept/reject" process is to them.

[3] While this sounds like a reasonable consideration, the Clerk has presented no evidence showing how prevalent this issue is and how often the

due to reporting on a complaint that was later rejected by the Clerk's Office for failure to comply with court rules.

Apart from the merits of the case, the Clerk argued that federal courts should abstain from adjudicating this case under the *Younger* abstention doctrine. See *Younger v. Harris*, 401 U.S. 37 (1971). The Clerk argued that *Younger* abstention should apply because CNS was asking a federal court for injunctive relief against a state official who was acting pursuant to a state court's standing order (Order No. 2014-02). According to the Clerk, the state court order requires her to perform an "accept/reject" function, whereas the federal court injunction being sought by CNS would require immediate release. She argued that she would be unable to comply with both.

The district court granted CNS's motion for a preliminary injunction on January 8, 2018. The court rejected the Clerk's abstention arguments, reasoning that *Younger* abstention did not apply because there were "no ongoing state judicial proceedings with which CNS's requested injunctive relief might interfere." The court relied on *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992), to conclude that the lack of a state proceeding made *Younger* abstention inappropriate.

---

Clerk's Office catches information that should not have been included. The district court also was not "convinced that it is, in fact, the responsibility of the Clerk" to ensure this information is "not included in e-filings, as the Illinois Supreme Court rules pertaining to confidential and personal identity information specifically place the burden of compliance on the filing parties." 2018 WL 318485, at *5. We agree with this latter point as a matter of law. However, we do not believe the Clerk's Office is somehow prohibited from checking for compliance by fallible attorneys and *pro se* parties.

The district court then turned to the merits and determined that a First Amendment right of access applies and that Seventh Circuit precedent requires that access be "immediate and contemporaneous." 2018 WL 318485, at *3, citing *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994), and *In re Associated Press*, 162 F.3d 503, 506 (7th Cir. 1998). In the district court's view, the Clerk's stated reasons were insufficient to justify the delays in access, so that the delays violate the Constitution. The district court ordered the Clerk to implement within thirty days "a system that will provide access to newly e-filed civil complaints contemporaneously with their receipt by her office." 2018 WL 318485, at *7. Clerk Brown filed a notice of appeal and a motion to stay the preliminary injunction pending appeal. The district court denied that motion, but this court then granted a stay.[4]

II.  *Analysis*

   A.  *Standard of Review*

To obtain a preliminary injunction, a plaintiff must first show that: (1) without such relief, it will suffer irreparable harm before final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of success on the merits. E.g., *Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018), citing *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If a plaintiff makes such a showing, the court next must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with

---

[4] This court received helpful amicus briefs from the Judicial Council of California in support of Clerk Brown and the Reporters Committee for Freedom of the Press in support of CNS.

one. See *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). This assessment is made on a sliding scale: "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Girl Scouts of Manitou Council*, 549 F.3d at 1086, quoting *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). Finally, the court must ask whether the preliminary injunction is in the public interest, which entails taking into account any effects on non-parties. *Id.* at 1086. Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

In reviewing the grant or denial of a preliminary injunction on appeal, we examine "legal conclusions de novo, findings of fact for clear error, and the balancing of harms for abuse of discretion." *Valencia*, 883 F.3d at 966, citing *Coronado v. Valleyview Pub. Sch. Dist. 365–U*, 537 F.3d 791, 795 (7th Cir. 2008). In reviewing the district court's decision whether to abstain, the underlying legal questions are subject to *de novo* review, and the ultimate decision itself is reviewed for abuse of discretion. *Property & Casualty Ins. Ltd. v. Central National Ins. Co. of Omaha*, 936 F.2d 319, 321 (7th Cir. 1991).

B.  *Right of Access*

While the First Amendment does not explicitly mention a right of access to court proceedings and documents, "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978). This right of access has its roots in the common law, but the Supreme Court has held that the First

Amendment itself protects access to criminal trials. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576–78 (1980) (plurality opinion). The Supreme Court has also cautioned against any "narrow, literal conception" of the First Amendment's terms, *NAACP v. Button*, 371 U.S. 415, 430 (1963), and has explained that

> the Framers were concerned with broad principles, and wrote against a background of shared values and practices. The First Amendment is thus broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights.

*Globe Newspaper Co. v. Superior Court for the County of Norfolk*, 457 U.S. 596, 604 (1982) (citations omitted).

"[A] major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Id.*, quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966). "Free speech carries with it some freedom to listen," so the Supreme Court has reasoned that freedom of speech and freedom of the press "would lose much meaning if access to … the trial could … be foreclosed arbitrarily." *Richmond Newspapers*, 448 U.S. at 576–577. Press access in particular is important:

> In a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press … With respect to judicial proceedings in particular, the function of the press serves to … bring

to bear the beneficial effects of public scrutiny upon the administration of justice.

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491–92 (1975).

Though the Supreme Court has not yet extended these principles from criminal proceedings, the federal courts of appeals have widely agreed that the First Amendment right of access extends to civil proceedings and associated records and documents. See *Courthouse News Serv. v. Planet*, 750 F.3d 776, 786 (9th Cir. 2014) ("*Planet I*"), citing *In re Continental Illinois Sec. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984) (finding right of access by press to litigation committee reports in shareholder derivative suits); *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 305 (2d Cir. 2012) (finding right of access to administrative civil infraction hearings); *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1061 (3d Cir. 1984) ("We hold that the First Amendment does secure a right of access to civil proceedings."); *Brown & Williamson Tobacco Corp. v. Federal Trade Comm'n*, 710 F.2d 1165, 1177 (6th Cir. 1983) (First Amendment limits judicial discretion to seal documents in civil case). The press's right of access to civil proceedings and documents fits squarely within the First Amendment's protections.

Yet the press's right of access to court documents is not absolute—it is qualified. *Nixon*, 435 U.S. at 598; *Globe Newspaper*, 457 U.S. at 606. There is a constant tension between the interest in public disclosure and privacy concerns. To determine whether a right of access attaches under the First Amendment, courts use the two-part test set out in *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986) ("*Press-Enterprise II*"). This test is generally referred to as the "experience and logic test." It asks whether a proposed right reflects a

well-developed tradition of access to a specific process and whether the right "plays a significant positive role in the functioning of the particular process in question." *Id.* at 8. If so, a rebuttable presumption of access applies. *Id.* at 9.

This is the framework for analyzing restrictions on the press's right of access to court proceedings and documents. Here, both parties agree there is a qualified right of access to civil complaints. The dispute is about timing: does the right of access attach at the moment a complaint is received by the Clerk's Office, or does it attach at the moment processing is completed? How long a delay in access is too long?

While the delays appear to be minimal, we do not answer these questions here. We conclude that the state courts deserve the first opportunity to hear such a constitutional challenge to their internal procedures. The vast majority of access precedents arise from litigation before the courts whose records are at issue. In this case, however, CNS is seeking to have one court tell another court that its level of access is not good enough. Further, many access disputes concern documents in a single case, whereas the relief sought here is far-reaching. It would apply to all civil cases filed in one of the busiest county courts in the country. "Every court has supervisory power over its own records and files," *Nixon*, 435 U.S. at 598, and at least at this time, we decline to impose a requirement on the state court that we do not meet ourselves, at least not yet.[5]

_____

[5] We recognize that the district court here concluded that "immediate and contemporaneous" access was required by our decision in *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994), which used that language. We said that the "newsworthiness of a particular story is often fleeting," and that "each passing day may constitute a separate and cognizable infringement of the First Amendment." *Id.*, quoting

C.  *Abstention*

This action falls within the terms of 42 U.S.C. § 1983: plaintiff CNS claims that its federal constitutional rights are being violated by a person acting under color of state law. But the relief plaintiff seeks here directly affects the administration of the state courts and "would run contrary to the basic principles of equity, comity, and federalism." See *SKS & Associates, Inc. v. Dart*, 619 F.3d 674, 676–77 (7th Cir. 2010) (affirming abstention in federal case seeking injunction directing management of state courts' eviction cases). Even though abstention is the exception, not the rule, e.g., *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976), a federal court "may, and often must, decline to exercise its jurisdiction where doing so would intrude upon the independence of the state courts." *SKS & Associates*, 619 F.3d at 677. As the Supreme Court has put it, federal courts may decline to exercise jurisdiction where denying a federal forum would "clearly serve an important countervailing interest," including "regard for federal-state relations." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). "This equitable decision balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court,

---

*Nebraska Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 (1975) (Blackmun, J., in chambers) (staying state-court order restricting media coverage of pending criminal case). *Grove Fresh* addressed delays on the order of months and years, not hours or even minutes. Our decision in *Grove Fresh* approved a review process for documents that would require adversarial exchanges lasting weeks before the sealed information would be released. *Id*. at 898. *Grove Fresh* continues to provide helpful guidance on the qualified right of public access to court filings. It does not, however, compel the instant access to every filing in all civil (or criminal) cases ordered by the district court here.

against the State's interests in maintaining 'uniformity in the treatment of an "essentially local problem."'" *Id.* at 728, quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 362 (1989).

State courts have a significant interest in running their own clerks' offices and setting their own filing procedures—especially in a court like the Circuit Court of Cook County, where more than one million cases are filed annually. When these procedures are challenged as they have been here, the state courts should be given the first opportunity to determine precisely what level of press access is required, appropriate, and feasible in a state court. CNS has not yet sought relief in the state courts here. Proceeding straight to the federal court to resolve a dispute with a state court clerk over the timing of access conflicts with the general principles of federalism, comity, and equity that underlie abstention. Unless and until the state courts have proven unwilling to address an alleged First Amendment violation—which we are not yet convinced exists—the federal courts should not exercise jurisdiction over the matter.

1.  *The Abstention Doctrines*

The Supreme Court has recognized four principal categories of abstention: *Pullman*, *Burford*, *Younger*, and *Colorado River*, named after *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); *Younger v. Harris*, 401 U.S. 37 (1971); and *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). Two additional categories, *O'Shea* and *Rizzo*, can be considered extensions of *Younger*. See *O'Shea v. Littleton*, 414 U.S. 488 (1974); *Rizzo v. Goode*, 423 U.S. 362 (1976). *Younger*, with its extension in *O'Shea* and *Rizzo*, is most closely applicable to the present

case; however, it is not a perfect fit, and we ultimately base our decision on the more general principles of federalism that underlie all of the abstention doctrines.

*Younger* abstention ordinarily requires federal courts to refrain from exercising jurisdiction over federal constitutional claims that seek to interfere with or interrupt ongoing state proceedings. *FreeEats.com, Inc. v. Indiana*, 502 F.3d 590, 595 (7th Cir. 2007). *Younger* abstention originally required federal courts to abstain when a criminal defendant seeks a federal injunction to block his state court prosecution on federal constitutional grounds. See 401 U.S. at 40–41. The Supreme Court has extended the doctrine to civil proceedings in limited circumstances, beginning with *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 603–04 (1975). As we noted in *SKS & Associates*:

> The civil brand of *Younger* extends only to a federal suit filed by a party that is the target of state court or administrative proceedings in which the state's interests are so important that exercise of federal judicial power over those proceedings would disregard the comity between the states and federal government. See *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 13 (1987) (requirement for the posting of bond pending appeal); *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 432–34 (1982) (attorney disciplinary proceedings); *Trainor v. Hernandez*, 431 U.S. 434, 444 (1977) (civil proceedings seeking return of welfare payments wrongfully received); *Juidice v. Vail*, 430 U.S. 327, 335–36 & n.12 (1977) (civil contempt proceedings); *Huffman*, 420 U.S. at 604 (state court action to close

> adult theater); *Majors v. Engelbrecht*, 149 F.3d
> 709, 712–13 (7th Cir. 1998) (nursing license sus-
> pension proceedings before state administrative
> board).

619 F.3d at 678.

The situation here is not a traditional *Younger* scenario: there is no individual, ongoing state proceeding that plaintiffs seek to enjoin. As a result, the district court found *Younger* abstention specifically inapplicable. It is true that in *Ankenbrandt v. Richards*, the Supreme Court stated: "Absent any *pending* proceeding in state tribunals, therefore, application by the lower courts of *Younger* abstention was clearly erroneous." 504 U.S. 689, 705 (1992) (emphasis in original). We have also explained that a "paramount concern" in whether to abstain under *Younger* is that "the judicial or judicial in nature state proceedings must be on-going." *Barichello v. McDonald*, 98 F.3d 948, 955 (7th Cir. 1996). While this case does not fit neatly into the *Younger* doctrine, it fits better into the Supreme Court's extension of the *Younger* principles in *O'Shea* and *Rizzo*.

In *O'Shea*, plaintiffs filed a federal lawsuit asserting that a municipal court system was intentionally discriminating against African Americans in setting bail and in sentencing. 414 U.S. at 491–92. The district court dismissed the case, but this court reversed, holding that if plaintiffs proved their allegations, the district court should fashion appropriate injunctive relief to prevent the state court judges from depriving others of their constitutional rights in the future. *Id.* at 492–93. The Supreme Court granted certiorari and reversed this court, finding that the claims were not ripe because there was an insufficient probability that the plaintiffs would be brought

before the municipal courts again on criminal charges. *Id.* at 495–99. The Court also found that even if the claims were ripe, the principles of *Younger* should lead the federal courts to abstain. The Court reasoned that comity and federalism "preclude[d] equitable intervention" because the plaintiffs sought "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials." *Id.* at 499–500. The Court cautioned against injunctions that would lead to "an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris* … and related cases sought to prevent." *Id.* at 500.

In *Rizzo*, the Supreme Court further extended the principles of *Younger* to limit federal court review of local executive actions. In that case, the plaintiffs alleged a pattern of unconstitutional police mistreatment of minority civilians in Philadelphia. 423 U.S. at 366. The Third Circuit affirmed the district court's injunction requiring city officials to come up with a "comprehensive program" for dealing with civilian complaints pursuant to the court's detailed guidelines. *Id.* at 364–66, 369–70. In reversing the injunction, the Supreme Court explained that the "District Court's injunctive order here, significantly revising the internal procedures of the Philadelphia police department, was indisputably a sharp limitation on the department's latitude in the dispatch of its own internal affairs." *Id.* at 379 (quotation marks omitted). The Court reasoned:

> When a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court system, his case must contend with the well-established rule that the Government has

> traditionally been granted the widest latitude in the dispatch of its own internal affairs. *   *   *
>
> When the frame of reference moves from a unitary court system, governed by the principles just stated, to a system of federal courts representing the Nation, subsisting side by side with 50 state judicial, legislative, and executive branches, appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief.

*Id.* at 378–79 (internal citations and quotation marks omitted). The Court noted that "federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Id.* at 378, citing *Stefanelli v. Minard*, 342 U.S. 117, 120 (1951).

While the district court's order in the present case does not map exactly on the orders in *O'Shea* and *Rizzo*, it would also impose a significant limit on the state courts and their clerk in managing the state courts' own affairs. Against the backdrop of *Younger*, *O'Shea*, and *Rizzo*, we find that CNS's request for federal intrusion at this stage of the dispute between CNS and the Clerk calls for abstention.

2.  *Abstention Principles: Equity, Federalism, and Comity*

The situation here is quite similar to *SKS & Associates*, where we applied the principles of *Younger* and declined to exercise jurisdiction over a Section 1983 action against the Chief Judge and the Sheriff of Cook County. 619 F.3d at 676. In that case, the Sheriff was subject to a general order issued by the Chief Judge that directed him not to carry out

residential evictions during a two-and-a-half-week period in December and during periods of extreme cold weather. *Id.* The plaintiff, a residential property manager, sought a federal injunction against the Sheriff to speed up the eviction processes in state court. *Id.*

In declining to exercise jurisdiction, we explained that it is important for federal courts to have ''a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.'' *Id.*, citing *New Orleans Public Service*, 491 U.S. at 364, citing in turn *Younger*, 401 U.S. at 44. We concluded that it was not appropriate for the federal courts, in the face of these principles of equity, comity, and federalism, to undertake the requested supervision of state court operations. *SKS & Associates*, 619 F.3d at 682.

Despite *SKS & Associates* not being a typical *Younger* scenario, we pointed out that the Supreme Court characterized the holding of *Younger* as "far-from-novel" because it rested primarily on the ''even more vital consideration'' of comity. *Id.* at 678 (citations omitted). ''Cooperation and comity, not competition and conflict, are essential to the federal design,'' and *Younger* abstention ''reinforces our federal scheme.'' *Kowalski v. Tesmer*, 543 U.S. 125, 133 (2004), citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 586 (1999). Abstention in the present case tracks these general principles upon which all of the abstention doctrines are based. The level of intrusion CNS seeks from the federal court into the state court's operations

is simply too high, at least before the state courts have had a chance to consider the constitutional issue.

Underlying *Younger* abstention is a deeper principle of comity: the assumption that state courts are co-equal to the federal courts and are fully capable of respecting and protecting CNS's substantial First Amendment rights. As the Supreme Court underscored in *Younger*, the Constitution established

> a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

401 U.S. at 44.

This principle of comity takes on special force when federal courts are asked to decide how state courts should conduct their business. The Illinois courts are best positioned to interpret their own orders, which are at the center of this case, and to craft an informed and proper balance between the state courts' legitimate institutional needs and the public's and the media's substantial First Amendment interest in timely access to court filings. It is particularly appropriate for the federal courts to step back in the first instance as the state courts continue to transition to electronic filing and, like many courts around the country, are working through the associated implementation challenges and resource limitations. The claims

here are not suitable for resolution in federal court at this time. CNS is free to pursue a remedy in the state courts.

We acknowledge that the Ninth Circuit in *Courthouse News Service v. Planet*, a case nearly identical to this one, came to the opposite conclusion regarding abstention. 750 F.3d 776, 793 (9th Cir. 2014). The court there explained that CNS's claims "raise novel and important First Amendment questions that the federal courts ought to decide" and reversed the district court's decision to abstain "so that the First Amendment issues presented by this case may be adjudicated on the merits in federal court, where they belong." *Id.* In declining to abstain under *O'Shea*, the Ninth Circuit explained that an injunction would not lead to continuous oversight of the state courts by the federal court. *Id.* at 791. The Ninth Circuit thought there would be no "ongoing federal audit" and that the "remedy that CNS seeks is more akin to [a] bright-line finding" rather than an impermissible "ongoing monitoring of the substance of state proceedings." *Id.* (citations omitted). Thus, the Ninth Circuit concluded, the First Amendment interests at stake outweighed what it thought would be minimal interference in the state's administration of its judicial system.

On this point, we respectfully disagree with our colleagues in the Ninth Circuit. If the state court clerk refuses or fails to comply with the federal court's injunction or complies only partially, the federal court's involvement would certainly continue as it oversees the implementation of its order. Further, we have no doubt CNS would attempt to use a different decision in this case to force the hand of other state courts that do not provide immediate press access to court filings. This would likely lead to subsequent litigation in the federal courts. We want to avoid a situation in which the

federal courts are dictating in the first instance how state court clerks manage their filing procedures and the timing of press access. We also want to avoid the problems that federal oversight and intrusion of this sort might cause.[6]

In sum, the district court erred by exercising jurisdiction and issuing a preliminary injunction. Initial adjudication of this dispute in the federal court would run contrary to the considerations of equity, comity, and federalism as detailed in *SKS & Associates* and the Supreme Court abstention decisions on which *SKS & Associates* was based. This temporal access dispute with a state court clerk should be heard first in the state courts.

The district court's order granting a preliminary injunction is REVERSED, and the case is REMANDED with instructions to dismiss this action without prejudice.

---

[6] Because this opinion creates a circuit conflict on the abstention issue, we circulated it to all judges in active service. See 7th Cir. R. 40(e). No judge in active service requested to hear the case *en banc*.