In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-2589

CAMELOT BANQUET ROOMS, INC., *et al.*,

*Plaintiffs-Appellees,*

*v.*

UNITED STATES SMALL BUSINESS ADMINISTRATION, *et al.*,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:21-CV-00447-LA — **Lynn Adelman**, *Judge.*

ON MOTION FOR STAY PENDING APPEAL

DECIDED SEPTEMBER 15, 2021

Before KANNE, ROVNER, and HAMILTON, *Circuit Judges.*

PER CURIAM. Plaintiffs in this case are about fifty businesses all over the country that offer live adult entertainment in the form of nude or nearly nude dancing. They seek to obtain loans under the second round of the Paycheck Protection Program enacted by Congress to address economic disruption caused by the Covid-19 pandemic. By statute, Congress excluded plaintiffs and several other categories of businesses

from the second round of the Program. See 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa), incorporating 13 C.F.R. § 120.110, with two exceptions.

Plaintiffs assert that their exclusion from the Program violates their constitutional rights, primarily under the Free Speech Clause of the First Amendment. The district court agreed. It issued a preliminary injunction that enjoins the United States Small Business Administration (SBA) from denying plaintiffs eligibility for the loan program based on the statutory exclusion that incorporates 13 C.F.R. § 120.110. *Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin.*, — F. Supp. 3d —, 2021 WL 3680369 (E.D. Wis. Aug. 19, 2021). The SBA has appealed and seeks a stay of the injunction pending appeal. The district court denied a stay on August 31. *Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin.*, — F. Supp. 3d —, 2021 WL 3878977 (E.D. Wis. Aug. 31, 2021). Later that day we issued a temporary stay pending expedited briefing on the stay issue, which was completed on September 9.

We now grant the government's stay of the preliminary injunction and expedite briefing on the merits of this appeal. The government's merits brief shall be filed no later than September 29, 2021; plaintiffs shall file their brief no later than October 13, 2021; and the government shall file any reply brief no later than seven days after plaintiffs file their brief. The court will contact counsel to schedule oral argument promptly.

I.   *Applicable Legal Standards*

Plaintiffs who seek a preliminary injunction must show that (1) they will suffer irreparable harm in the absence of an injunction, (2) traditional legal remedies are inadequate to

remedy the harm, and (3) they have some likelihood of success on the merits. If those elements are shown, the court must then balance the harm the moving parties would suffer without an injunction against the harm the opposing parties would suffer if one is granted, and the court must consider the public interest, which takes into account the effects of a decision on non-parties. E.g., *Courthouse News Service v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

On the merits, the district court concluded that plaintiffs are likely to succeed on their free speech claim. The court viewed the exclusion of plaintiffs from the Program as an "attempt to suppress a dangerous idea" and a classification that was not rationally related to a legitimate government purpose. The court found that the other factors also supported an injunction. Receiving funds under the Program only at the end of the lawsuit would likely come too late for plaintiffs' businesses to survive, and they would have no viable damages remedy against the government or any official. The court saw little harm to the government from an injunction, which it thought would also serve the public interest by aiding struggling businesses, consistent with the aims of the broader Covid relief legislation.

On appeal, we review the district court's issuance of a preliminary injunction for an abuse of discretion, though an error of law can often produce an abuse of discretion. E.g., *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 896 (7th Cir. 2001); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992).

In deciding whether to stay an injunction pending appeal, we apply a standard that parallels the preliminary injunction standard but also keeps in mind the district court's exercise of

equitable discretion. A party seeking a stay must show a likelihood of success on the merits and a threat of irreparable harm absent a stay. If those criteria are satisfied, we must consider the balance of harms, primarily in terms of the balance of risks of irreparable harm in case of a judicial error, and we must consider the public interest, which refers primarily to the interests of those who are not parties to the suit. See generally *Nken v. Holder*, 556 U.S. 418, 426 (2009); *Whole Woman's Health Alliance v. Rokita*, — F.4th —, 2021 WL 4077549 (7th Cir. Sept. 8, 2021) (granting stay pending appeal); *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020) (noting earlier denial of injunction pending appeal).

We conclude that the SBA has satisfied the demanding standard for a stay of an injunction pending appeal. As we explain below, at this preliminary stage, the SBA has shown a strong likelihood of success on the merits. The other factors are essentially a wash, so the final result is driven by the likelihood of success on the merits.

## II. *The Paycheck Protection Program*

No American who has lived through the Covid-19 pandemic will forget its devastating consequences for lives and health or the massive economic disruption it has caused. Congress responded with several rounds of massive economic assistance, including the Paycheck Protection Program. Under the Program, many small businesses became eligible for low-interest loans that would be guaranteed by the federal government and even eligible for forgiveness if the businesses used them, in essence, to keep employees on the payroll during the economic downturn.

The first round of legislation gave the SBA considerable discretion to decide eligibility for the Program. In doing so, the SBA borrowed from a regulation that identifies categories of businesses that are not eligible for all or nearly all SBA loan programs. 13 C.F.R. § 120.110. The list includes non-profit enterprises, banks and other financial companies, life insurance companies, businesses located in foreign countries, pyramid sale distribution plans, casinos and other gambling businesses, loan packagers, political or lobbying businesses, and speculative businesses.

Subsection (p) of that regulation excludes plaintiffs. It bars:

> Businesses which:
>
>> (1) Present live performances of a prurient sexual nature; or
>>
>> (2) Derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature….

§ 120.110(p).

In the first round of Paycheck Protection Program loans, the SBA made an exception for non-profits, which the statute expressly deemed eligible. See 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020). In an earlier related case brought by plaintiff Camelot Banquet Rooms in the Eastern District of Wisconsin, the district court issued a preliminary injunction barring denial of eligibility for the Program based on the regulation. That decision relied on statutory, administrative law, and constitutional grounds. *Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin.*, 458 F. Supp. 3d 1044 (E.D. Wis. 2020). We denied

a stay of that injunction in a conclusory order, and the government soon dismissed the appeal. But see *Pharaohs GC, Inc. v. U.S. Small Business Admin.*, 990 F.3d 217 (2d Cir. 2021) (affirming denial of injunction in similar first-round case brought by adult-entertainment club); *American Ass'n of Political Consultants v. U.S. Small Business Admin.*, 810 F. App'x 8, 9–10 (D.C. Cir. 2020) (affirming denial of injunctive relief in similar First Amendment challenge to first-round exclusion of lobbying and political consulting businesses).

The second round of the Paycheck Protection Program took a different approach to eligibility. Congress adopted statutory language to exclude several categories of businesses, including plaintiffs' adult-entertainment venues. It did so by incorporating into the statute the terms of 13 C.F.R. § 120.110, the regulation that the SBA had used on its own initiative for the first round. 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa).[1]

Accordingly, in this second round, the earlier issues of statutory interpretation and administrative law have fallen away. Plaintiffs can prevail only if denying them a subsidized loan under the Program violates the Constitution. Plaintiffs seem unlikely to be able to make that showing.

---

[1] Congress made exceptions for two categories of businesses in the regulation, not-for-profit businesses and businesses engaged principally in teaching, instructing, counseling, or indoctrinating religion or religious beliefs. 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa). The new exception for religious businesses is easy to understand in light of *Trinity Lutheran Church v. Comer*, 137 S. Ct. 2012 (2017) (religious school could not be excluded from government program to assist school playground construction). The Supreme Court has shown no indication that it would extend the Free Exercise Clause reasoning of *Trinity Lutheran* to cases like this one.

III. *Plaintiffs' First Amendment Theory*

Plaintiffs' core claim is under the Free Speech Clause of the First Amendment. They contend that excluding them from the Program penalizes them for engaging in expressive activity protected by the First Amendment. See generally *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66 (1991) (plurality opinion) (treating nude dancing as "marginally" within outer perimeters of First Amendment protection; affirming local ban on completely nude dancing).

The problem with plaintiffs' First Amendment claim and the preliminary injunction here is that Congress is not trying to regulate or suppress plaintiffs' adult entertainment. It has simply chosen not to subsidize it. Such selective, categorical exclusions from a government subsidy do not offend the First Amendment.

The Supreme Court has repeatedly drawn a line between government regulation of speech, on one hand, and government subsidy of speech on the other. Its decisions show that the government is not required to subsidize activity simply because the activity is protected by the First Amendment. E.g., *Ysursa v. Pocatello Education Ass'n*, 555 U.S. 353, 358–59 (2009) ("While in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political ones"; state could choose not to carry out payroll deductions for political contributions to labor unions); *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so

doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other."); *Regan v. Taxation With Representation*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right…."); accord, e.g., *Wisconsin Education Ass'n Council v. Walker*, 705 F.3d 640, 646–47 (7th Cir. 2013).

To avoid the controlling line of subsidy cases, plaintiffs focus on language in *Regan* suggesting that a selective subsidy program may violate the First Amendment if it is "aim[ed] at the suppression of dangerous ideas." 461 U.S. at 548. To take an easy example, even if Congress can exclude lobbyists entirely from the Program's subsidies, it could not choose to subsidize Democratic lobbyists while excluding Republicans. Plaintiffs' theory here is that Congress chose to exclude their businesses from the subsidy program because it deemed their "ideas" about sexuality to be dangerous.

This theory does not seem to distinguish between government *suppression* of protected activity and *denial of a subsidy*. Plaintiffs' theory seems to be that the denial of a subsidy *is itself the act of suppression*. That theory loses sight of the difference between regulation and denial of a subsidy—the difference at the heart of *Regan*, *Rust*, *Ysursa*, and the rest of the selective-subsidy line of cases. The only sign we see here of a supposed effort to "suppress" is the choice not to subsidize. Whatever door *Regan* left open—and as far as we can tell, the Supreme Court has never struck down a denial of subsidy on this ground—it surely requires something more, like viewpoint discrimination, than denial of the subsidy itself. See *Wisconsin Education Ass'n*, 705 F.3d at 650–52, and *id*. at 664–

70 (Hamilton, J., dissenting in relevant part) (majority and dissent debating evidence of viewpoint discrimination in state's choice to subsidize payroll deductions for dues for some public employee unions but not others).

IV. *Rational-Relation Review*

Like any statutory classification, the statutory boundaries of the Paycheck Protection Program are subject to rational-relation review. See, e.g., *Ysursa*, 555 U.S. at 359, citing *Regan*, 461 U.S. at 546–51. The district court found here that the exclusion of plaintiffs' adult-entertainment businesses fails the rational-relation test.

The district court appears to have applied an erroneous and unduly rigorous form of judicial review, second-guessing legislative decisions and compromises on policy grounds, and concluding that the Program was over- and under-inclusive in various respects. See *Camelot Banquet Rooms, Inc.*, — F. Supp. 3d at —, 2021 WL 3680369, at *8–11. A government spending program, especially one responding to an economic emergency, is subject to the least rigorous form of judicial review. In enacting such legislation, Congress must respond quickly to an emergency and must hammer together a coalition of majority votes in both houses. The need for compromises and trade-offs is never greater.

When pressed in this suit to justify the exclusion of plaintiffs from the Program's subsidies, the government pointed to the "secondary effects" of sex-oriented businesses that can be used to justify time, place, and manner regulations of such businesses. See, e.g., *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000) (plurality opinion); *BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015). Plaintiffs and the district court responded

by criticizing Congress for not having made a record on the subject at the time the legislation was enacted.

Any expectation that Congress would have taken the time to make such a record would seem unrealistic, to put it mildly. Any expectation or demand that Congress must make such a record is contrary to constitutional doctrine. The rational-relation test requires a challenger in litigation to exclude any possible rational grounds that the legislature might have deemed sufficient grounds for the statutory distinction. E.g., *Heller v. Doe*, 509 U.S. 312, 319–20 (1993). It does not require the legislature to have made a contemporaneous record on the subject. *Id*. at 320–21, discussed in *Wisconsin Education Ass'n*, 705 F.3d at 653 (rational basis for limit on government subsidies need not be in the record "so long as it finds 'some footing in the realities of the subject addressed by the legislation'").

Similarly, plaintiffs' and the district court's assertion that the rationale for excluding plaintiffs is under-inclusive is not easy to reconcile with the rational-relation test. All sorts of legislative classifications, exclusions, and compromises pass muster even if they are over- or under-inclusive. "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality,'" and "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Heller*, 509 U.S. at 321, first quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970), and

then quoting *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70 (1913).

Plaintiffs also suggest that the government's defense based on secondary effects of sex-oriented businesses actually serves to condemn their exclusion from the Program. They say the arguments show the government's hostility to their "dangerous ideas." This argument seems to turn the rational-relation test upside down. Those secondary effects are well-known and widely recognized in First Amendment litigation and doctrine. See generally, e.g., *City of Erie*, 529 U.S. at 289–301 (plurality opinion). Actual evidence of them can serve to justify time, place, and manner restrictions on businesses that are subject to "intermediate" constitutional scrutiny. Relying on those effects does not show animus toward any idea. If those effects can support time, place, and manner regulations, they surely provide a rational basis for Congress to choose not to subsidize this group of businesses.

Plaintiffs' arguments also seem to lose sight of the fact that they were not singled out for this exclusion, even among businesses primarily engaged in activity protected by the First Amendment. Congress also chose to exclude from the Program businesses "primarily engaged in political or lobbying activities." 13 C.F.R. § 120.110(r). Such business activities are much closer to the core of the First Amendment than the dances at plaintiffs' bars and clubs. Yet lobbyists and political consultants were also excluded. Congress chose not to require taxpayers to subsidize them. We do not see a plausible constitutional basis for requiring government subsidies of lobbyists, at least as long as there is no viewpoint discrimination. Accord, *American Ass'n of Political Consultants*, 810 F. App'x at 9–10.

Congress also excluded many other categories of businesses: banks, lenders, finance companies, and some pawn shops; life insurance companies; businesses located in foreign countries; pyramid sale distribution plans; businesses engaged in any illegal activity; private clubs; government-owned businesses; loan packagers; businesses with an "Associate" who is in prison, on probation, on parole, or who has been indicted for a felony or crime of moral turpitude; and businesses that have previously defaulted on SBA or other federally assisted loans. See 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa), incorporating 13 C.F.R. § 120.110, with two exceptions.

These exclusions are not difficult to understand in terms of policy and politics. They all help defuse potential "gotcha" criticisms of this generous emergency program that might be used to undermine political support for the Program and the overall legislation. Such tailoring of legislation to build and maintain political support is perfectly constitutional, at least in the absence of viewpoint or invidious discrimination, of which we see no signs here.[2]

V. *Viewpoint Discrimination*

The district court was persuaded to apply more stringent judicial review. The theory was that even if the exclusion of plaintiffs' businesses from the Program was not "traditional

---

[2] The Constitution does not prohibit legislation on the basis of morality. Consider, for example, the possibility that Congress might choose to exclude from this or other subsidy programs alcoholic beverage makers, casinos and other gambling businesses, weapons makers, and so on. Such line-drawing is left to the legislature, absent viewpoint or invidious discrimination.

viewpoint discrimination," the exclusion's focus on "prurience" created a free speech problem. The exclusion, as the court saw the issue, depends on prurience, which the court saw as the expressive, "sexually arousing" "message" of the adult entertainment. *Camelot Banquet Rooms, Inc.*, — F. Supp. 3d at — & n.7, 2021 WL 3680369, at *9–10 & n.7. The court viewed the exclusion as thus an effort to use a subsidy exclusion to suppress a "dangerous idea," which *Regan* suggested could violate the First Amendment. 461 U.S. at 548.

Plaintiffs' argument along these lines is creative but is not consistent with the role that prurience plays in the larger sweep of First Amendment doctrine. The statutory exclusion from the Program of businesses with prurient live entertainment is better understood not as viewpoint discrimination but as a permissible classification based on subject matter. The Supreme Court made this point in *R.A.V. v. City of St. Paul*:

> When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists. Such a reason, having been adjudged neutral enough to support exclusion of the entire class of speech from First Amendment protection, is also neutral enough to form the basis of distinction within the class. To illustrate: A State might choose to prohibit only that obscenity which is the most patently offensive *in its prurience—i.e.*, that which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive *political* messages.

505 U.S. 377, 388 (1992), citing *Kucharek v. Hanaway*, 902 F.2d 513, 517 (7th Cir. 1990).

In effect, the Court was telling us, it would be a category mistake to think that prurience or lasciviousness reflects a "viewpoint" that the government may not discriminate against. The terms instead identify a *category* or subject matter of expressive conduct that may be subject to some forms of government regulation. That's the point we made in the *Kucharek* case cited in *R.A.V.* We said that a statute could prohibit obscene (prurient) material entirely (a subject matter) but could not "distort the marketplace of erotic discourse by suppressing only that obscenity which conveys a disfavored message." 902 F.2d at 517.

Accordingly, excluding the entire category or subject matter of prurient live performances from a government subsidy program does not violate the Free Speech Clause. See *Pharaohs GC*, 990 F.3d at 231 (term "prurient" in SBA regulation describes subject matter, not viewpoint, for exclusion from Program); *PMG Int'l Division L.L.C. v. Rumsfeld*, 303 F.3d 1163, 1171 (9th Cir. 2002) (treating "lascivious" materials as articulating a "viewpoint" would "risk eviscerating altogether the line between content and viewpoint"); *General Media Communications, Inc. v. Cohen*, 131 F.3d 273, 282 (2d Cir. 1997) ("[H]ow, for example, would one go about discussing and considering the political issues of the day from a lascivious viewpoint?").

## VI. *Other Factors for Stay Pending Appeal*

Finally, the other factors for a stay pending appeal either favor the government or are neutral. Each side faces a threat of irreparable harm, depending on whether the injunction

goes into effect or is stayed. If the government were erroneously required to guarantee subsidized loans to plaintiffs, there is no reason to expect that it could ever recover such funds. Because the government seems so likely to prevail on the merits, a stay serves the public interest by implementing the policy chosen by Congress. On the other hand, if the government were unlikely to prevail on the merits, denial of a stay would serve the public interest by enforcing constitutional rights and allowing plaintiffs to take advantage of a generous program of emergency economic relief. On balance, the government's strong likelihood of success on the merits of this challenge to plaintiffs' exclusion from a government subsidy program persuades us that we should stay the preliminary injunction and expedite briefing and decision on the merits of this appeal.

So ordered.